278 F.3d 1323

**Greg RUGGIERO, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**No. 00–1100.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 6, 2001.

Decided Feb. 8, 2002.

On Petition for Review of an Order of the Federal Communications Commission.

Robert T. Perry argued the cause for petitioner Greg Ruggiero. With him on the briefs was Barbara J. Olshansky.

Jacob M. Lewis, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the briefs were Robert S. Greenspan, Attorney, Jane E. Mago, Acting General Counsel, Federal Communications Commission, Daniel M. Armstrong, Associate General Counsel, John E. Ingle, Deputy Associate General Counsel, C. Grey Pash, Jr. and Lisa E. Boehley, Counsel.

Before: HENDERSON, ROGERS, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Dissenting opinion filed by Circuit Judge KAREN LeCRAFT HENDERSON.

TATEL, Circuit Judge:

In this case, an unlicensed microbroadcaster—a "pirate"—challenges the constitutionality of the Radio Broadcasting Preservation Act of 2000's character qualification provision, which permanently prohibits anyone who ever "engaged in any manner in the unlicensed operation of any station in violation of ... the Communications Act of 1934" from obtaining a low-power FM radio license. To survive First and Fifth Amendment challenges in this Circuit, restrictions limiting the future

lawful speech of a well-defined class of broadcasters must be more than "min-im[ally] rational[ ]." *News Am. Publ'g, Inc. v. FCC,* 844 F.2d 800, 812, 814 (D.C.Cir.1988) ("*News America*"). Finding nothing in the Act, its legislative history, or the record before us to justify the character qualification provision's unique and draconian sanction for broadcast piracy, nor to explain why a more limited restriction would not achieve Congress's objective, we hold that the provision and its implementing regulation fail to meet this standard and are therefore unconstitutional.

### I.

Section 301 of the Communications Act of 1934 makes it unlawful to operate a radio station without a license issued by the Federal Communications Commission. 47 U.S.C. § 301. When the Commission began licensing FM radio stations in the 1940s, it licensed both high-power stations and low-power, or "Class D," educational stations operating with a maximum of ten watts of power. In 1978, however, the Commission concluded that the Class D stations were impeding expansion of more efficient high-power operations. Opting to "str[ike] the balance in favor of licensing higher powered stations to ensure that large audiences were served," the Commission stopped licensing low-power stations and required most existing stations to upgrade to at least 100 watts. Creation of Low Power Radio Serv., 15 F.C.C. Rcd. 19,208, 19,236 (2000) ("First Low–Power Reconsideration") (recons.) (discussing the 1978 rule, Changes in the Rules Relating to Noncommercial Educ. FM Broad. Stations, 70 F.C.C.2d 972, 983 (1979) (codified at 47 C.F.R. § 73.512(d))).

Over the next two decades, often in open defiance of this rule, individual pirates began operating unlicensed low-power sta-tions that broadcast local news, music, and commentary. Known as "microradio," this phenomenon expanded significantly in the late 1990s after Congress amended the Telecommunications Act to eliminate restrictions on the number of radio stations any one person or entity could own. Telecommunications Act of 1996, Pub.L. No. 104–104, § 202(a), (b), 110 Stat. 56, 110–12 (1996). Following the amendment, ownership of licensed radio stations became increasingly concentrated, leading—according to microradio proponents—to a "marked decline in serious local radio news reporting" and a corresponding increase in the perceived importance and, in turn, number of unlicensed low-power stations. Pet'r's Br. at 6–7. In response to this microradio expansion, the Commission cracked down on pirates, ordering them to cease broadcasting and taking legal action against those who refused. *See, e.g., Grid Radio v. FCC,* 278 F.3d 1314 (D.C.Cir. 2002); *United States v. Dunifer,* 219 F.3d 1004 (9th Cir.2000).

In 1999, the Commission again changed course, seeking public comment on proposed rules that would allow licensing of low-power stations. The Commission observed that in contrast to 1978, when it first adopted the microbroadcasting ban, "[n]ow, . . . radio service is widely available throughout the country and very little spectrum remains available for new full-powered stations," so licensing low-power stations could "fill . . . gaps in the spectrum that would otherwise go unused," First Low–Power Reconsideration, 15 F.C.C. Rcd. at 19,236, providing a "low-cost means of serving" both urban and rural areas, Creation of Low Power Radio Serv., 14 F.C.C. Rcd. 2471, 2471 (1999) ("Low–Power Proposal") (notice of proposed rulemaking). Many groups submitted comments, with students, religious groups, and labor unions generally sup-

porting the low-power program, and the established broadcasting industry (including National Public Radio and other noncommercial broadcasters) opposing it.

In January 2000, the Commission issued an order authorizing two new classes of low-power stations: 100–watt stations, reaching a radius of roughly 3.5 miles, and 10–watt stations, reaching a radius of less than 2 miles. Creation of Low Power Radio Serv., 15 F.C.C. Rcd. 2205, 2205, 2210–12 (2000) ("First Low–Power Rulemaking"). The order encouraged local ownership of low-power stations, limited the number of such stations any single entity could own, required the stations to operate on a noncommercial, educational basis, and prohibited existing media entities from holding interests in them. *Id.* at 2215–25. The order also included a provision addressing license applications by broadcast pirates. Concerned that those who had flouted the licensing process in the past could not be trusted "to deal truthfully with the Commission and to comply with [its] rules and policies," the Commission provided that it would only accept low-power applications from individuals who certified (under penalty of perjury) that if they had operated illegally in the past, they ceased all such operations either within twenty-four hours of being directed by the Commission to do so or within ten days of publication of the Low–Power Proposal. *Id.* at 2225–26. The Commission also extended this requirement to all parties to any corporate applicant, including the applicant's "parents, its subsidiaries, their officers and members of their governing boards." *Id.* at 2223–26.

This version of the low-power rules was short-lived. Less than a year after the rules' promulgation, Congress, responding to broadcast industry lobbying, *see, e.g.,* 146 Cong. Rec. S8197–8211 (statement of Sen. Grams) (discussing licensed broad-

casters' concerns about the low-power rules), passed the Radio Broadcasting Preservation Act of 2000 ("RBPA"), Pub.L. No. 106–553, 114 Stat. 2762 (2000). The RBPA directs the Commission to amend the low-power rules to limit the frequencies available for low-power stations, thus reducing the risk of interference to existing stations. Central to this case, the Act also directs the Commission to deny licenses to all applicants whose officers or board members ever "engaged in any manner in the unlicensed operation of any station in violation" of the Communications Act. *Id.* § 632(a)(1)(B). This "character qualification provision" thus eliminates the distinction the Commission had drawn between those erstwhile broadcast pirates who voluntarily ceased broadcasting within a specified period and those who refused. The provision also rescinds the Commission's discretion to waive the character qualification requirement in cases in which, despite an applicant's—or a party to an applicant's—unlicensed broadcasting, the Commission finds no reason to question the applicant's potential reliability as a licensee. *Id.* § 632(a)(2)(B).

Following passage of the RBPA, the Commission issued rules implementing the Act's character qualification provision. Creation of Low Power Radio Serv., 16 F.C.C. Rcd. 8026, 2001 WL 310997, 2001 FCC LEXIS 1760 (2001) ("Second Low–Power Rulemaking") (amending First Low–Power Rulemaking). Under the new rules—described by the Commission as "minor amendment[s]" that merely "codif[y] a Congressional requirement"—all pirates and former pirates are automatically and permanently disqualified from applying for low-power licenses. *Id.,* 2001 FCC LEXIS 1760, at *15. Moreover, an applicant is deemed "ineligible to hold [a low-power] license if it has engaged in unlicensed operation *regardless of whether the Commission has made a specific find-*

*ing that the party has engaged in such conduct."* *Id.,* 2001 FCC LEXIS 1760, at *14 (emphasis added).

## II.

Petitioner Greg Ruggiero, an acknowledged former pirate affiliated with microbroadcasting stations in New York City and elsewhere, argues that facially and as applied to him, the character qualification provision and implementing regulation violate the First and Fifth Amendments to the United States Constitution. Before considering the merits of Ruggiero's challenge, we must deal with the Commission's argument that we lack jurisdiction for two independent reasons: because Ruggiero failed to file a petition for review, and because he lacks Article III standing. We consider each in turn.

### *Petition for Review*

■ Resolving the Commission's first argument requires an understanding of the history of this case. Ruggiero originally filed a petition for review of the Commission's First Low–Power Rulemaking, in which he argued that the then-current version of the licensing restriction violated both the Administrative Procedure Act and the First Amendment. Following passage of the RBPA, we remanded the record to the Commission and directed the parties to file supplemental briefs addressing Ruggiero's standing to pursue his First Amendment claim, as well as the merits of that claim as applied "to the Act and any implementing orders or regulations the Commission may issue." Order of the United States Court of Appeals for the District of Columbia Circuit at 1 (Jan. 8, 2001) (No. 00–1054) ("Order of Jan. 8, 2001"). After the Commission issued the Second Low–Power Rulemaking, the parties submitted the requested supplemental briefs, and we heard oral argument on

Ruggiero's constitutional claims—expanded by a footnote in Ruggiero's Supplemental Brief to include a claim under the Fifth Amendment—as applied to the RBPA and the new rules.

The Commission now argues that because Ruggiero never filed a petition for review of the Second Low–Power Rulemaking, this court lacks jurisdiction to hear his constitutional challenge. We disagree. Although it is true that Ruggiero did not file a second petition for review, he did, as we directed, file a brief addressing the constitutionality of the RBPA and the Commission's implementing regulation, and that brief, in all but title, satisfies the four statutory requirements for a petition for review of the Second Low–Power Rulemaking. Specifically, as required by 28 U.S.C. § 2344, Ruggiero filed the brief within sixty days of the rulemaking; stated "the nature of the proceedings as to which review is sought, ... the facts on which venue is based, ... the grounds on which relief is sought, and ... the relief prayed"; attached a copy of the challenged rulemaking; and served the brief on the Commission and the United States Department of Justice. *See generally* Pet'r's Supp. Br. at 1–10, App. B, Certificate of Service. Accordingly, we may treat the brief as the "functional equivalent" of a petition for review. *See Smith v. Barry,* 502 U.S. 244, 248–49, 112 S.Ct. 678, 682, 116 L.Ed.2d 678 (1992) (internal citations omitted) (construing pro se brief as notice of appeal and noting that "[i]f a document filed within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal"); *Moore v. United States Dep't of Transp.,* 3 Fed. Appx. 508, 512,(7th Cir.2001) (unpublished disp.) (citing *Smith v. Barry* and construing brief as "functional equivalent of a timely petition for review" of agency action).

This liberal construction of 28 U.S.C. § 2344 makes particular sense in this case. For one thing, as we learned at oral argument, Ruggiero filed no second petition for review solely because we had directed him to file a supplemental brief addressing the applicability of his First Amendment claims to the RBPA and any subsequent implementing regulations. *See* Order of Jan. 8, 2001, at 1; *cf. Moore v. South Carolina Labor Bd.*, 100 F.3d 162, 163 (D.C.Cir.1996) (discussing "the unique circumstances doctrine, under which appellate courts will excuse an untimely notice of appeal where the appellant could have filed a timely notice but was misled to delay filing by a court order or ruling which purportedly extended or tolled the appeal deadline" (citing, inter alia, *Thompson v. INS*, 375 U.S. 384, 387, 84 S.Ct. 397, 398–99, 11 L.Ed.2d 404 (1964) (applying the doctrine))). Moreover, we maintained jurisdiction of Ruggiero's claims throughout the Commission's implementation of the RBPA, remanding only the record for further Commission action. Order of Jan. 8, 2001, at 1; *see also* D.C. CIR. R. 41(b). Finally, Ruggiero's original contentions, made in his brief challenging the First Low–Power Rulemaking, are sufficiently broad to cover at least his First Amendment challenge to the character qualification provision and implementing regulation. His original brief asserted that the Commission "violated [his] First Amendment rights in disqualifying [him] from holding a low power FM radio station license" and that "[t]he [a]utomatic [d]isqualification [p]olicy [l]acks the [n]arrow [t]ailoring [r]equired by the First Amendment." Pet'r's Br. at 2, 23. These broadly worded objections to the First Low–Power Rulemaking are equally valid as objections to the amended rules, as Ruggiero continues to argue primarily that the Commission violated his First Amendment rights by automatically disqualifying him and other unlicensed microbroadcasters from holding low-power licenses. *Cf. Tenn. Gas Pipeline Co. v. FERC*, 871 F.2d 1099, 1109 (D.C.Cir.1989) (finding jurisdiction to review claims despite appellant's failure to file new FERC petition for rehearing because most of appellant's objections to agency's first decision, raised in timely petition for review, were "equally valid" as objections to agency's amended decision).

## Standing

█ In support of its argument that Ruggiero lacks Article III standing, the Commission relies on two basic facts: First, although Ruggiero once operated an unlicensed microradio station, he is not now an applicant for a low-power license, nor is he associated with any such applicant; and second, Ruggiero is a resident of New York City where, all concede, no spectrum space is available for low-power stations. In response, Ruggiero claims that but for the RBPA's character qualification provision, he would associate with a low-power applicant. To support this assertion, he submitted a declaration by the President of a Greenville, South Carolina station stating that the station has applied for a low-power license and that "[b]ut for the character qualification provisions[,] ... [it] would offer [Ruggiero] a position on [its] board of directors." Wangaza Decl. para. 3. Because the Commission challenges none of the declaration's factual assertions, we think Ruggiero has established the prerequisites for Article III standing: a personal injury (inability to become a director of the Greenville station), fairly traceable to the challenged action (the character qualification provision and implementing regulation), and likely to be redressed by the requested relief (a declaration that the provision and regulation are unconstitutional). *See Lu-*

**380**

*jan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992).

We are equally unpersuaded by the Commission's secondary standing argument: that Ruggiero is a "poor candidate" to challenge the character qualification provision because, given his history of deliberate and willful licensing violations, the Commission would be unlikely to grant him a license even in the absence of the provision. This may be true, but it is irrelevant. Ruggiero alleges only that the RBPA's per se ban deprives him of the right to compete in the low-power licensing process, and the Supreme Court has held that such allegations are sufficient for Article III standing. *See Northeastern Fla. Chapter of the Assocd. Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.").

## III.

■ To evaluate the constitutionality of the RBPA's character qualification provision—and, in turn, the implementing regulation—we must first identify the appropriate level of First and Fifth Amendment scrutiny. The parties agree, as they must in view of *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), that the "scarcity of broadcast frequencies" necessitates that "broadcast regulations receive more lenient [First Amendment] scrutiny than ones affecting other types of speech." *News Am.,* 844 F.2d at 811. Going fur-

ther, the Commission asserts that under *FCC v. National Citizens Committee for Broadcasting,* we should ask only whether the challenged character qualification provision "is based on consideration of permissible factors and is otherwise reasonable." 436 U.S. 775, 793, 98 S.Ct. 2096, 2111, 56 L.Ed.2d 697 (1978) ("*NCCB*"). We disagree.

To begin with, neither *NCCB* nor any subsequent Supreme Court case supports the Commission's position that *all* "reasonable" broadcasting restrictions automatically pass constitutional muster. *NCCB* involved both statutory and constitutional challenges to Commission regulations governing cross-ownership of broadcast stations and daily newspapers in the same community ("the cross-ownership rules"). Although the *NCCB* Court did indeed observe that the Commission has broad regulatory authority to "issue regulations codifying its view of the public-interest licensing standard, so long as that view is based on consideration of permissible factors and is otherwise reasonable," it made that statement when describing the Commission's mandate under the Communications Act. 436 U.S. at 793, 98 S.Ct. at 2111. Turning to the petitioner's First Amendment arguments, the Court indicated only that regulation of broadcast frequencies is permissible if the regulation is content-neutral and preserves "the interests of the 'people as a whole ... in free speech.'" *Id.* at 800, 98 S.Ct. at 2114 (quoting *Red Lion Broad. Co.,* 395 U.S. at 390, 89 S.Ct. at 1806). Concluding that the challenged cross-ownership regulations meet both requirements, the Court found the regulations "a reasonable means of promoting the public interest in diversified mass communications." *Id.* at 802, 98 S.Ct. at 2115. The Court expressly distinguished broadcast regulations that turn "on the content of constitutionally protect-

ed speech," however, and said nothing about restrictions—like those at issue here—that permanently limit the speech of certain specific individuals. *Id.* at 801, 98 S.Ct. at 2115.

Supreme Court case law since *NCCB*, moreover, confirms that some broadcast regulations merit heightened scrutiny. In *FCC v. League of Women Voters*, for example, the Court used intermediate scrutiny to strike down a statute that banned noncommercial educational stations from "engag[ing] in editorializing." 468 U.S. 364, 366, 104 S.Ct. 3106, 3110, 82 L.Ed.2d 278 (1984). The Court observed that although "the broadcasting industry . . . operates under restraints not imposed upon other media," restrictions that constrain broadcasters' choices about the viewpoints presented fail constitutional scrutiny unless "narrowly tailored to further a substantial governmental interest." *Id.* at 380, 104 S.Ct. at 3118.

Finally, in *News America*, we expressly rejected rational-basis review as the standard for evaluating the constitutionality of a broadcasting restriction analogous to the one challenged here. *See* 844 F.2d at 810–14. In that case, we confronted a statute that forbade the Commission from extending existing waivers of the cross-ownership rules. The provision affected only two such waivers, both held by a single publisher/broadcaster, Rupert Murdoch. News America's challenges to the provision "l[ay] at the intersection of the First Amendment's protection of free speech and the Equal Protection Clause's requirement that government afford similar treatment to similarly situated persons." *Id.* at 804. Reviewing the case law, we identified a "spectrum" of possible broadcast restrictions, "from the purely content-based (*e.g.*, 'No one shall criticize the President') to the purely structural (*e.g.*, the cross-ownership rules themselves)," and suggested

that the applicable level of constitutional scrutiny increases with the extent to which a challenged provision relies on the identity of the speaker or the content of the covered speech. *Id.* at 812. On this spectrum, we continued, the "prohibition at issue in *League of Women Voters* [was] at some remove from pure content, as it forbade 'editorializing' of any kind by the covered stations[,]" while the challenged prohibition on extending cross-ownership waivers was "far from purely structural . . . as it applie[d] to a closed class of one publisher broadcaster." *Id.* Concerned that "the safeguards of a pluralistic political system are often absent when the legislature zeroes in on a small class of citizens[,]" but wary of *League of Women Voters*' intermediate-scrutiny standard, we concluded, "[w]hat suffices for this case is that more is required than 'minimum rationality.'" *Id.* at 814. Applying this heightened rational basis standard to the challenged provision, we concluded that the provision's narrow focus on extensions of *existing* waivers of the newspaper-*television* cross-ownership rules—rather than, for example, extensions of *future* waivers, or extensions of waivers of the newspaper-*radio* cross-ownership rules—rendered the prohibition unconstitutionally underinclusive. *See id.* at 814–15.

■ Like the prohibition at issue in *News America*, the RBPA's character qualification provision raises both First Amendment and Equal Protection concerns, as it restricts future lawful speech (licensed broadcasting) and applies to a limited class of pirates and former pirates. *See* 844 F.2d at 812. True, as the dissent points out, Dissent at 1334 n.1, the class of pirate microbroadcasters is neither "closed" nor as small as *News America*'s single-member class, but the former class is well defined (consisting of all pirates), and the character qualification provision

382

focuses on it "with the precision of a laser beam." *News Am.,* 844 F.2d at 814. The character qualification provision, moreover, is far more severe than the *News America* prohibition: An unlicensed broadcaster can never lawfully operate a low-power station anywhere in the country, whereas even under the *News America* prohibition, Rupert Murdoch could lawfully have operated a television station outside of any community in which he "own[ed] or control[led] a daily newspaper." *Id.* at 803; *cf. NCCB,* 436 U.S. at 800, 98 S.Ct. at 2115 (holding that the cross-ownership rules do not "condition receipt of a broadcast license upon forfeiture of the right to publish a newspaper" because even "[u]nder the regulations, . . . a newspaper owner need not forfeit anything in order to acquire a license for a station located in another community"). On the other hand, like the *News America* prohibition, the character qualification provision is not purely content-based, nor does it ban "a form of speech . . . that lies at the heart of First Amendment protection," as did the prohibition on editorializing at issue in *League of Women Voters.* 468 U.S. at 381, 104 S.Ct. at 3118. As in *News America,* therefore, we find ourselves in a middle ground, sure only that the appropriate standard is neither *NCCB*'s minimal scrutiny nor *League of Women Voters'* intermediate scrutiny. Also as in *News America,* however, we need not "exact[ly] characteriz[e] . . . the proper standard," for "any that is appreciably more stringent than 'minimum rationality' requires invalidation of the challenged [provision]." 844 F.2d at 802.

## IV.

■ The RBPA's meager legislative history suggests that in enacting the statute's character qualification provision, Congress sought to increase compliance with Commission regulations in two ways: by deterring future operation of unlicensed stations and by preventing former pirates—who Congress evidently believes would violate other Commission rules if given the opportunity—from obtaining licenses. *See* H.R.Rep. No. 106–567, at 8 (2000) ("[O]peration of an unlicensed station demonstrates a lack of commitment to follow the basic rules and regulations which are essential to having a broadcast service that serves the public."); 146 Cong. Rec. S613–S626 (2000) (statement of Senator Gregg) (arguing that permitting pirates to obtain low-power licenses would "reinforce their unlawful behavior and encourage[ ] future illegal activity by opening the door to new unauthorized broadcasters"); *see also* Resp'ts' Br. at 7–8 ("[T]he statute . . . is reasonably designed to avoid licensing those whose past conduct portends future unlawful behavior."). Accepting the legitimacy of this broad goal, we nevertheless believe that the character qualification provision suffers from the same defect that doomed the statute challenged in *News America*: The provision "bears only the most strained relationship to [its ostensible] purpose." 844 F.2d at 814.

To begin with, the provision is "astonishingly underinclusive," *id.* at 814, excluding some "conduct that seems indistinguishable in terms of [the] ostensible purpose" of increasing regulatory compliance, *id.* at 805. Specifically, the provision bans low-power license applications only from broadcasters who have operated without a license, leaving the Commission free to evaluate applications from anyone else under its preexisting, more permissive character qualification policy. *See* Policy Regarding Character Qualifications in Broad. Licensing, 102 F.C.C.2d 1179, 1229 (1986), *recon. granted in part and denied in part,* 1 F.C.C. Rcd. 421 (1986). As a result, civil wrongdoers, felons, and even inveterate regulatory violators other than pirates, re-

tain the opportunity to demonstrate that notwithstanding their offenses, they can reliably operate microbroadcast stations in the public interest. In Modesto Broadcast Group, for example, the Commission considered a license application filed by a station whose general manager had operated with relatively high, nighttime-authorized power during the day, risking interference with other stations. 7 F.C.C. Rcd. 3404, 3422 (1992). The Commission ultimately rejected the application, but only after considering such factors as the willfulness, duration, and timing of the general manager's violations—factors that the RBPA prohibits the Commission from considering in cases involving pirates who seek microbroadcast licenses. *See id.*; *see also Alessandro Broad. Co.*, 99 F.C.C.2d 1, 11 n. 13 (1984) (refusing to disqualify applicant for new broadcast station permit even though applicant's controlling shareholder had been convicted of second degree murder because "the crime was an isolated event that occurred in the remote past and the state authorities . . . [had] determined officially that [the shareholder was] rehabilitated," so there was "no predictive nexus between his past crime and his current and future fitness to be a Commission licensee"); *TelePrompTer Cable Sys., Inc.*, 40 F.C.C.2d 1027, 1028 (1973) (noting that "violations of Federal antitrust laws are not absolutely disqualifying, but are a circumstance from which the Commission may draw inferences as to probable future conduct"). Moreover, the Commission may still grant *full*-power licenses to stations affiliated with former unlicensed broadcasters. Neither Congress nor the Commission has articulated any justification for this double standard. If former misconduct portends noncompliance with Commission regulations, why should former violators of any relevant federal law or regulation be eligible to apply for any broadcast license?

Of course, "Congress ordinarily need not address a perceived problem"—here, the possibility of future regulatory violations by past wrongdoers—"all at once," but we have rejected this "facile one-bite-at-a-time explanation" for otherwise inexplicable underinclusiveness in "rules affecting important First Amendment values." *News Am.*, 844 F.2d at 815. Our dissenting colleague omits the latter half of this quoted passage, arguing that even in the First Amendment context, Congress may "permissibly tackle a single part of a perceived problem . . . through a statute . . . which is neither overinclusive nor underinclusive." Dissent at 1335 & n.2. But the RBPA's underinclusiveness (and indeed its overinclusiveness, too, as we discuss below) is the precise issue at hand. The dissent's argument proves too much, relabeling any perceived underinclusiveness as a permissible attempt to address "a single part of a perceived problem." Dissent at 1335 n.2.

The character qualification provision is poorly aimed for another reason: It covers circumstances only marginally related to the purpose of increasing regulatory compliance. For example, the provision bans applications from former unlicensed operators who violated the licensing requirement only briefly or long ago; from operators who have since exhibited, in whatever manner, an ability to abide by federal laws and regulations; from operators who plan to serve only as members of a multi-member board, rather than as president or CEO of an applicant station; from operators who shut down immediately upon receiving a Commission order to do so; and, most tellingly, from operators who were unaware of the licensing requirement at the time of the violation. Again, neither Congress nor the Commission has explained how a restriction that ignores such factors accurately targets those former pi-

rates who pose a real risk of future malfeasance.

These examples of the character qualification provision's under- and overinclusiveness are particularly troubling given the ready availability of a less restrictive and better aimed alternative: the analogous provision in the First Low–Power Rulemaking, which allowed for the possibility of waiver in certain circumstances and applied only to former pirates who continued to operate in spite of a Commission request to shut down. *Cf. NCCB,* 436 U.S. at 802 n. 20, 98 S.Ct. at 2116 n.20 ("The reasonableness of the [challenged cross-ownership] regulations as a means of achieving diversification is underscored by the fact that waivers are potentially available from ... [the] rules in cases in which a broadcast station and a co-located daily newspaper cannot survive without common ownership."); *also News Am.,* 844 F.2d at 814 (questioning Congress's chosen approach to the identified problem of "temporary waivers 'creeping' into permanence" and suggesting alternative legislative solutions). Though potentially still underinclusive, such a limited restriction would not only permit the Commission to grant a license to rehabilitated former pirates, but more accurately identify likely future rule-breakers. Indeed, adopting this limited regulatory restriction in the first place, the Commission rejected the very per se ban that Congress has now enacted, *see* First Low–Power Rulemaking, 15 F.C.C. Rcd. at 2225–26, reasoning that "[t]he reliability as licensees of parties who ... illegally operated for a time but ... ceased operation after being advised of an enforcement action ... is not necessarily as suspect" as that of "[p]arties who persist[ed] in unlawful operation after the Commission [took] ... enforcement actions," Low–Power Proposal, 14 F.C.C. Rcd. at 2498.

Overall, therefore, we find the character qualification provision so poorly aimed at maximizing future compliance with broadcast laws and regulations as to "raise[ ] a suspicion" that perhaps Congress's "true" objective was not to increase regulatory compliance, but to penalize microbroadcasters' "message." *News Am.,* 844 F.2d at 805. Indeed, Ruggiero expressly alleges viewpoint discrimination, pointing to statements in the record that suggest many former pirates violated the licensing requirement solely because they questioned the constitutionality of the now-defunct microbroadcasting ban and viewed their piracy as "civil disobedience." *See, e.g.,* Creation of Low Power Radio Serv., Comment of Civil Rights Orgs., *reprinted in* J.A. 325 ("[O]ne who broadcasts openly, willingly accepting that the government will attempt to shut her station down, is engaging in an act of civil disobedience."); Creation of Low Power Radio Serv., Comment of Professor Robert McChesney, *reprinted in* J.A. 339 ("The tremendous demand for microradio is demonstrated by the emergence of a national Free Radio Movement, widespread civil disobedience, ... as well as the proliferation of unlicensed community radio stations ... whose operators broadcast at the risk of financial losses, seizure of property, arrest, and in some cases, imprisonment."). We need neither endorse the pirates' tactics— in fact, in *Grid Radio,* 278 F.3d at 1321–22 (also issued today), we reject an argument that penalizing microbroadcasting piracy violates the First Amendment—nor believe the RBPA discriminates against pirates' "message" to conclude, as we did in *News America,* that the provision's inaccurate aim is fatal.

We emphasize that this result does not leave Congress and the Commission powerless to bar some past pirates from applying for licenses. While that might well be the outcome were we applying intermedi-

ate scrutiny, we read *News America*'s more permissive standard as leaving ample room for a carefully aimed licensing restriction. Indeed, the Commission already has authority under its general character qualification provision to deny licenses to individual pirates who, in the Commission's considered judgment, have demonstrated an inability to "comply with the Communications Act and [Commission] rules and policies." Policy Regarding Character Qualifications in Broad. Licensing, 102 F.C.C.2d at 1183. Even under the *News America* standard, however, we cannot sanction an automatic and permanent restriction on unlicensed broadcasters' future lawful speech without understanding why their misdeeds warrant a penalty so much more severe than that applied to any other misconduct. Yet neither the RBPA itself, nor the legislative history, nor the record in this case provides a satisfactory explanation. We thus have no choice but to declare the statute and the Commission's implementing regulation unconstitutional.

## V.

The petition for review is granted, the Second Low–Power Rulemaking is vacated, and this matter is remanded to the Commission for further proceedings not inconsistent with this opinion.

*So ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting:

I dissent from the majority's holding that the challenged provision of the Radio Broadcasting Preservation Act (Act)—withholding future low power FM (LPFM) licenses from those who have illegally engaged in LPFM broadcasting in the past—falls short of the "something more than minimum rationality"standard adopted in *News America Publishing, Inc. v. FCC*, 844 F.2d 800 (D.C.Cir.1988). Quoting *News America*, the majority charges that the Act's license restriction is so "poorly aimed at maximizing future compliance with broadcast laws and regulations as to 'raise[ ] a suspicion' that perhaps Congress's true objective was not to increase regulatory compliance, but to penalize pirate microbroadcasters' 'message.'" Maj. Op. at 384 (quoting 844 F.2d at 805). This case, however, is nothing like *News America*.

In *News America* the court overturned a funding resolution that barred the FCC from using appropriated funds "'to extend the time period of current grants of temporary waivers to achieve compliance with such rules.'" 844 F.2d at 802 (quoting Pub.L. No. 100–202, 101 Stat. 1329, 34 (1987)). The court found the provision "astonishingly underinclusive" for two reasons. First, it did not prohibit extension of waivers granted after its enactment but only of those already in existence. Second, it forbade only extensions of existing waivers and not the granting of new waivers. In fact, because of its narrow focus the restriction affected only a single party, News America Publishing, Inc., a corporation owned by Rupert Murdoch, striking him, in the court's words, "with the precision of a laser beam." 844 F.2d at 814. By contrast, the license restriction here applies to the entire class of those who as of the time of their license applications have unlawfully engaged in LPFM broadcasting.[1] Further, the restriction substan-

---

1. This class includes persons who broadcast illegally after the Act's passage as well as those who had already done so before enactment. It is therefore not a "closed" class as was the case in *News America*. *See* 844 F.2d at 810 & n. 13 (noting that challenged provision "impinges on a closed class" because "Murdoch is not only the sole current member of the class, but is the sole party that can ever be a member").

386

tially furthers the plain intent of the Congress which believed that "the operation of an unlicensed station demonstrates a lack of commitment to follow the basic rules and regulations which are essential to having a broadcast service that serves the public, and those individuals or groups should not be permitted to receive licenses in the LPFM service." H.R.Rep. No. 506 at 8 (2000). What could be more reasonable or logical than to suspect that those who ignored the Commission's LPFM broadcast regulations in the past are likely to do so in the future and therefore to head them off. The majority claims this class is underinclusive because it excludes a host of other scofflaws such as "civil wrongdoers, felons, and even inveterate regulatory violators other than pirates." Maj. Op. at 382. As the majority acknowledges, however, " 'Congress ordinarily need not address a perceived problem ... all at once.' " Maj. Op. at 383 (quoting *News America*, 844 F.2d at 815.).[2] It is no surprise that in legislation addressing LPFM licensing the Congress began with known violators of LPFM regulations. In any event, given that the class's members here are many and unidentified, *see supra* note 1, I am at a loss to understand how we can infer the Congress intended to

punish any particular "message" the way the senators mentioned in *News America* targeted Murdoch's message.[3]

---

**2.** As the majority points out, the court in *News America* noted other courts' rejection of the "one-bite-at-a-time explanation for rules affecting important First Amendment values." *News America*, 844 F.2d at 815, *quoted in* Maj. Op. at 1332. Judging from the examples cited in *News America*, the court meant only that a proffered governmental interest will not suffice if the challenged statute does not reasonably serve the interest, that is, if the statute is underinclusive or overinclusive or both. *See FCC v. League of Women Voters*, 468 U.S. 364, 396, 104 S.Ct. 3106, 3126, 82 L.Ed.2d 278 (1984) (striking down statute of "patent overinclusiveness and underinclusiveness" because it "clearly 'provide[d] only ineffective or remote support for the government's purpose.' ") (quoting *Central Hudson*

*Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980)); *Community–Serv. Broadcasting v. FCC*, 593 F.2d 1102 (D.C.Cir. 1978) (rejecting statute that "[a]t best ... serves as an overly restrictive means" of achieving asserted purpose) (en banc). I see no reason the legislature cannot permissibly tackle a single part of a perceived problem (including one touching on the First Amendment) through a statute, such as the one here, which is neither overinclusive nor underinclusive.

**3.** As the *News America* court recounted, Murdoch was thoroughly excoriated in the Senate shortly after the Act was passed. *See News America*, 844 F.2d at 807–10.