**GRID RADIO and Jerry Szoka, Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**National Association of Broadcasters, Intervenor.**

**Nos. 99–1463 and 99–1527.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 2001.

Decided Feb. 8, 2002.

Hans F. Bader argued the cause for appellants/petitioners. With him on the briefs was Michael E. Rosman. Michael P. McDonald entered an appearance.

Rodger D. Citron, Counsel, Federal Communications Commission, argued the cause for appellees/respondents. With him on the brief were Jane E. Mago, General Counsel, Daniel M. Armstrong, Associate General Counsel, Jacob M. Lewis and Mark Davies, Attorneys, U.S. Department of Justice. David Silberman, Counsel, Federal Communications Commission, entered an appearance.

Henry L. Baumann and Jack N. Goodman were on the brief for intervenor National Association of Broadcasters.

Before: TATEL and GARLAND, Circuit Judges, and WILLIAMS, Senior Circuit Judge.*

Opinion for the Court filed by Circuit Judge TATEL.

---

TATEL, Circuit Judge:

An unlicensed operator of a low-power FM radio station challenges a Federal Communications Commission order directing him to cease broadcasting. He contends the order and an ancillary $11,000 forfeiture are unenforceable because the Commission's ban on low-power FM stations, in place until January 2000, contravened the Communications Act of 1934 and the First Amendment, and because the forfeiture is unreasonable, excessive, and beyond his ability to pay. We reject these claims and affirm. Absent a demonstration that the low-power ban was indisputably unlawful or unconstitutional, the Commission had no obligation to reconsider the ban in the context of an enforcement proceeding against a single unlicensed operator. Moreover, the forfeiture is reasonable under the circumstances of this case, and the operator waived his inability-to-pay claim.

I.

Section 301 of the Communications Act of 1934 makes it unlawful to operate a radio station without a license from the Federal Communications Commission. 47 U.S.C. § 301. Historically, the Commission's elaborate licensing scheme included four classes of licenses—A, B, C, and D—distinguished on the basis of such factors as station location, antenna height, and transmission power. Until 1978, the Commission allocated Class D licenses to "microbroadcast stations," so called because they operate at power levels of less than one hundred watts and reach listeners within a two to twelve-mile radius of the point of transmission. In 1978, however, choosing to "str[ike] the balance in favor of licensing higher-powered stations to ensure that large audiences were served,"

* Senior Circuit Judge Williams was in regular active service at the time of oral argument.

the Commission adopted a "microbroadcasting ban" pursuant to which it stopped awarding Class D licenses. *Creation of a Low Power Radio Serv.*, 15 F.C.C. Rcd. 19,208, 19,236, 2000 WL 1434686 (2000) (reconsideration) (discussing *Changes in the Rules Relating to Noncommercial Educ. FM Broad. Stations,* 70 F.C.C.2d 972, 983, 1979 WL 44256 (1979) (codified at 47 C.F.R. § 73.512(d))).

At all times relevant to this case, appellant Jerry Szoka knew of both the licensing requirement and the microbroadcasting ban. Yet from 1995 until mid–2000, Szoka operated Grid Radio, an unlicensed low-power station in Cleveland, Ohio. He never applied for a license because he believed applying would be futile given the microbroadcasting ban.

In early 1997, after receiving a complaint about Grid Radio, the Commission sent Szoka two successive letters warning him that if he continued to operate the station, he could face fines, forfeitures, or criminal sanctions. Responding to the first letter, Szoka urged the Commission to "ignore" his unlicensed operations because Grid Radio "is top quality, provides a much needed community service without commercials, and [does not] interfer[e] with other stations." *Jerry Szoka,* 13 F.C.C. Rcd. 10,630, 10,630–31, 1998 WL 153227 (1998) (order to show cause). Nothing in the record indicates whether Szoka responded to the second letter.

Despite the Commission's letters, Szoka continued operating Grid Radio. *Id.* at 10,631. In response, the Commission issued an order directing Szoka to show cause why he should not be ordered to cease and desist from violating section 301. The show-cause order specified two issues for consideration at an upcoming hearing: whether Szoka was "transmitt[ing] radio energy without appropriate authorization," and if so, whether he "should be ordered to cease and desist" from that activity. *Jerry Szoka,* FCC 98D–3, 1998 FCC LEXIS 4563, *1, 1998 WL 559385 (1998) (ALJ summary decision). The order also indicated that the Commission was considering "whether ... Szoka should forfeit $11,-000"—the maximum daily penalty (adjusted for inflation) for a continuing violation of the Act. *Id.* at *1, *8 (citing 47 U.S.C. § 503(b)(2)(C)); *see also* 47 C.F.R. § 1.80(b)(5) (detailing how to adjust forfeitures for inflation).

The Chief of the Commission's Compliance and Information Bureau moved for summary decision of the issues identified in the show-cause order. Although Szoka conceded he had no license to operate Grid Radio, he objected to the summary judgment motion, arguing he had no obligation to comply with Commission licensing rules because the microbroadcasting ban was both unlawful and unconstitutional. He also challenged the forfeiture as unreasonable and excessive in violation of the Fifth and Eighth Amendments to the United States Constitution.

In light of Szoka's concession that he lacked a license to operate Grid Radio, the Administrative Law Judge concluded that no substantial issues of material fact remained, granted the Commission's motion for summary decision, issued a cease-and-desist order, and imposed the forfeiture. *Jerry Szoka,* 1998 FCC LEXIS 4563, at *3–4. In so doing, the ALJ rejected Szoka's constitutional challenges to the microbroadcasting ban on two alternative grounds: on the merits because the "right of free speech does not include the right to use radio facilities without a license"; and for lack of standing because Szoka failed to apply for either a license or a waiver of the microbroadcasting ban. *Id.* at *6–8 (citing *NBC v. United States,* 319 U.S. 190, 227, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); *United States v. Dunifer,* 997 F.Supp. 1235, 1241

(N.D.Cal.1998); *Stephen Paul Dunifer*, 11 F.C.C. Rcd. 718, 727, 1995 WL 457843 (1995)). Rejecting Szoka's Fifth and Eighth Amendment claims, the ALJ found that "imposition of a forfeiture is civil and not a criminal penalty," and that "the statutory scheme authorizing the [Commission] to enforce forfeitures ... contains appropriate safeguards which satisfy due process requirements...." *Id.* at *9–10.

The Commission affirmed the ALJ's order, finding Szoka without standing to challenge the licensing regulations and rejecting his constitutional challenges to the microbroadcasting ban and forfeiture. *Jerry Szoka*, 14 F.C.C. Rcd. 9857 (1999). The Commission informed Szoka that he could file a claim of inability to pay the forfeiture by submitting tax returns or other financial statements covering the previous three years. *Id.* at 9867.

Szoka filed petitions for reconsideration and for a stay of the orders against him, claiming, among other things, that he was unable to pay the forfeiture. In support, Szoka submitted a financial statement and tax returns for 1996 through 1998 showing $8,500 in assets and an annual adjusted gross income averaging about $12,000. *Jerry Szoka*, 14 F.C.C. Rcd. 20,147, 20,150, 1999 WL 867680 (1999) (reconsideration). The Commission denied Szoka's petitions for reconsideration and for a stay, and also rejected without a hearing his claim of inability to pay, finding that although Szoka's "stated assets and income do not appear to be large," he failed to "submit[ ] sufficient objective evidence and supporting information to sustain his claim that they are so inadequate as to render him unable to pay a forfeiture." *Id.* The Commission pointed out that although its Compliance and Information Bureau had invited Szoka to file further documentation in support of his financial claims, he failed to do so. *Id.* at 20,150 n. 2.

Following the Commission's rejection of Szoka's motion for reconsideration and for a stay, the cease-and-desist order became effective. Because Szoka continued to operate Grid Radio, the Commission filed suit in the United States District Court for the Northern District of Ohio to compel compliance. *See* 47 U.S.C. § 401(b) (authorizing Commission to "apply to the appropriate district court of the United States for the enforcement of [most orders of the Commission]"). Finding the cease-and-desist order "regularly made and duly served," the district court ordered Szoka to stop broadcasting by March 1, 2000. *United States v. Szoka*, 260 F.3d 516, 523 (6th Cir.2001) (citing district court's affirmance of the Commission's cease-and-desist order against Szoka) (internal quotation marks omitted). The Sixth Circuit affirmed, declining to reach Szoka's constitutional challenge to the microbroadcasting ban because in its view, the D.C. Circuit has exclusive jurisdiction to "nullify a cease-and-desist order based on unconstitutional regulations promulgated by the [Commission]." *Id.* at 528.

In the meantime, Szoka filed this appeal of the cease-and-desist order and forfeiture. He alleges that: (1) prior to issuing the cease-and-desist order, the Commission was obligated to demonstrate that shutting down Grid Radio would further the public interest; (2) the now-defunct microbroadcasting ban contravened the Act's requirement that the Commission regulate "in the public interest," 47 U.S.C. § 303(g); (3) the ban violated the First Amendment; (4) the forfeiture constitutes an "excessive fine[ ]" in violation of the Eighth Amendment; and finally, (5) the forfeiture is not the product of reasoned decision-making and should be reduced in light of Szoka's financial hardship. Although the Commission recently abandoned its microbroadcasting ban and

adopted new rules authorizing the licensing of low-power stations, *see Ruggiero v. FCC*, 278 F.3d 1323, 1325–27 (D.C.Cir. 2002), Szoka has not applied for a license under the new regime, nor does he challenge that regime here.

## II.

■ The Commission argues that because Szoka failed to apply for a license or to seek a waiver of the microbroadcasting ban, he lacks standing to raise his constitutional and statutory challenges. Since this argument implicates our jurisdiction, we consider it first.

The Commission's standing argument rests on its assertion that Szoka could have challenged the microbroadcasting ban without operating illegally—and therefore without subjecting himself to the cease-and-desist order or incurring the forfeiture. For example, the Commission points out that had Szoka applied for a waiver and the Commission denied his application, he could have appealed to this court and raised his constitutional and statutory challenges to the microbroadcasting ban at that time. 47 U.S.C. § 402(b)(1). Further, if Szoka had requested a waiver and the Commission had dragged its feet in responding to the request, Szoka could have petitioned this court for a writ of mandamus to compel Commission action. *See Telecomm. Research & Action v. FCC*, 750 F.2d 70, 79 (D.C.Cir.1984) (discussing this court's jurisdiction to hear claims of unreasonable agency delay). Given the number of lawful avenues available to him to challenge the microbroadcasting ban, the Commission argues, Szoka cannot now claim that his unlawful broadcasts were necessary to obtain judicial review of the ban. Thus, Szoka's injury is traceable not to the ban but to the more general prohibition against operating without a license, which Szoka does not challenge here. Accordingly, the Commission contends, Szoka has failed to demonstrate one of the prerequisites to Article III standing: a personal injury fairly traceable to the challenged Commission action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

We are unpersuaded. To begin with, the cease-and-desist order and forfeiture are, as Szoka argues, present injuries, both of which are fairly, if circuitously, traceable to the Commission's microbroadcasting ban. The record before us is clear: But for the ban, Szoka would have applied for a license, and the Commission points to no individual characteristics—of either Szoka or Grid Radio—that would have led it categorically to deny his application in the absence of the ban. Moreover, we agree with Szoka that applying for a waiver would have been futile. *See Prayze FM v. FCC*, 214 F.3d 245, 251 (2nd Cir.2000) (noting that although a plaintiff must generally submit to a policy "to establish standing to challenge" its constitutionality, "[t]his threshold requirement ... may be excused ... where a plaintiff makes a substantial showing that application for the benefit ... would have been futile"); *Ellison v. Connor*, 153 F.3d 247, 255 (5th Cir.1998) (same); *cf. DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236, 1238 (D.C.Cir.1987) (noting that "otherwise qualified non-applicants may have standing to challenge a disqualifying statute or regulation"). The Commission cites only two instances in the last two decades in which it granted a waiver to the microbroadcasting ban—once to an Indian village in Alaska, where the microbroadcasting ban does not apply, and once to a remote community in a Navajo-speaking area of New Mexico, where high-power, English broadcasts are of little relevance. *Turro v. FCC*, 859 F.2d 1498, 1500 n. 1

(D.C.Cir.1988) (noting these two instances). Neither of these waivers suggests that the Commission would seriously consider granting a waiver for Szoka to broadcast in English in Cleveland, Ohio. Finally, we agree with Szoka that because the Constitution permits a person faced with an unconstitutional licensing law to "ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license," the illegality of his unlicensed operations cannot, as the Commission implies, entirely preclude him from raising his constitutional claims. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

### III.

■■ Turning to the merits, we begin with Szoka's argument that under the Communications Act the Commission should have considered whether shutting down Grid Radio would further the public interest. According to Szoka, his station served a "niche audience" "not adequately serv[ed]" by full-power FM stations: "gay men and women and the arts community." Appellants' Br. at 11. Valuable as Grid Radio's broadcasts may have been, we think it clear that the Commission had no obligation to consider the station's individual circumstances before shutting it down. At the time this controversy began, the Commission had determined that the public interest was best served by uniformly denying licenses to low-power stations to promote "the establishment of more efficient, stable, full powered stations." *Creation of a Low Power Radio Serv.,* 15 F.C.C.Rcd. at 19,236 n. 93 (internal citations omitted). Although Szoka strenuously disagrees with that determination, the Commission need not reevaluate well-worn policy arguments each time it implements an existing rule in a narrow adjudicatory proceeding against an acknowledged rule-

breaker. *Turro,* 859 F.2d at 1500. To hold otherwise would obligate the Commission to "examine an entire range of policy questions that are not unique to [Szoka] and are more appropriately considered in a rulemaking proceeding." *Id.*

Nothing in *C.J. Community Services v. FCC,* 246 F.2d 660 (D.C.Cir.1957), requires a different result. Although we concluded there that the Commission could not shut down an unlicensed, low-power television booster station without considering whether "public interest, convenience, and necessity would be served," our concern related to the Commission's failure to consider or establish any licensing procedure for booster installations. *Id.* at 662 (complaining that the Commission had "not made it possible, after all these years, for the issuance of a license to a booster installation, such as is here disclosed"). This case is very different. Here, the Commission long ago established a licensing regime for broadcast stations and expressly decided not to issue licenses to low-power stations because of the risk of interference to higher-power stations. *Creation of a Low Power Radio Serv.,* 15 F.C.C. Rcd. at 19,236 n. 93. That decision would have no import if the Commission had an independent obligation to consider on a case-by-case basis the pros and cons of shutting down each individual, unlicensed microradio operation. Where, as here, the Commission has evaluated the public interest in a rulemaking, it would be absurdly inefficient—and would invite confusion—to require it to perform the same evaluation each time it enforces the resulting rule.

■ Szoka's broader claims—that the microbroadcasting ban itself was unlawful and unconstitutional, facially and as applied to him—present a harder question, for we generally permit "a party against whom a rule is [enforced] ... [to] pursue

substantive objections to the rule" at the time of enforcement. *Indep. Cmty. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C.Cir. 1999). Permitting Szoka or anyone else to operate without a license as a means of challenging the microbroadcasting ban, however, could produce the very "chaos" that, according to the Supreme Court, the broadcast licensing regime was designed to prevent. *Red Lion Broad. Co. v. FCC,* 395 U.S. 367, 375–76, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Moreover, we have no concern here that "limiting the right of review of the ... rule would effectively deny [Szoka] ... an opportunity to question its validity." *Functional Music, Inc. v. FCC,* 274 F.2d 543, 546 (D.C.Cir.1958). Szoka could have petitioned for a rulemaking or applied for a waiver and, if the Commission denied his request, challenged that denial in the appropriate circuit court. *See supra* p. 1319; 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a), (b)(1). That he did neither, choosing instead to operate without a license, makes it inappropriate for us to consider his challenge to the microbroadcasting ban absent "an undisputable indication ..., either because of the reasoning of a Supreme Court decision or intervening legislation," that the microbroadcasting ban was unlawful or unconstitutional. *Tribune Co. v. FCC,* 133 F.3d 61, 68 (D.C.Cir.1998) (applying a similarly narrow scope of review in a case involving an application for a waiver of certain broadcasting restrictions). Had Szoka provided such an indication, we would invalidate the cease-and-desist order and forfeiture. But none of his challenges to the microbroadcasting ban clears this high bar.

██ Szoka first argues that the microbroadcasting ban conflicts with the Commission's "affirmative mandate to maximize use of the spectrum resource." Appellants' Br. at 48. Yet the Commission resolved just this issue in its 1978 rulemaking when it concluded that licensing low-power stations would interfere with the propagation of higher-power stations. Because Szoka offers nothing to suggest that the 1978 policy was indisputably unlawful, we decline now to consider his challenge to it.

Recasting his public-interest argument as a challenge to the ban itself, Szoka next claims that under the Act, the Commission must be "flexible and responsive in applying its [microbroadcasting] rule[ ], so that the public interest in a particular case is not undermined by a rigid adherence to preestablished rules and regulations." *Id.* at 49. *Turro* also answers this claim: "Strict adherence to a general rule may be justified by the gain in certainty and administrative ease." 859 F.2d at 1500. Again, therefore, absent evidence that the microbroadcasting ban was indisputably unlawful, the Commission was entitled to adhere to it.

██ We reach a similar conclusion regarding Szoka's facial and as-applied constitutional claims. According to Szoka, to survive First Amendment scrutiny, "the ban must have been at least a narrowly tailored method of achieving a substantial governmental interest." Appellants' Br. at 35 (citing *FCC v. League of Women Voters,* 468 U.S. 364, 380, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984)). Under this intermediate scrutiny standard, he argues, the Commission "had an obligation to revisit the viability of microradio in light of rapid technological changes since [the ban was adopted in] 1978." Appellants' Br. at 37. That the Commission only began to reconsider its microbroadcasting ban in 1999, he implies, indicates that the ban was not narrowly tailored to the interest it served. Moreover, he claims that the original interest served by the ban—the need to promote stable, higher-power stations to

ensure efficient use of scarce spectrum—is no longer substantial given advances in broadcast technology.

We need not decide whether intermediate scrutiny is the appropriate standard of review, *see, e.g., News America Publ'g Inc. v. FCC,* 844 F.2d 800, 814 (D.C.Cir. 1988) (discussing the appropriate level of scrutiny to apply to a statute restricting broadcast speech), as we see two simpler responses to Szoka's arguments. First, although the Supreme Court has "obliquely suggested it might [one day] reconsider" the scarcity doctrine on which the microbroadcasting ban rests, judicial ambivalence falls far short of a "clear manifestation that [a] rule ... is [facially] illegal." *Tribune,* 133 F.3d at 68 (discussing *League of Women Voters,* 468 U.S. at 376–77 n. 11, 104 S.Ct. at 3115 n. 11). Second, Szoka offers no evidence to suggest that his circumstances were so unique as to impose on the Commission a constitutional obligation to *apply* the ban differently to him than to any other unlicensed microbroadcaster. Absent clear congressional or judicial signals that the microbroadcasting ban was unlawful, or unequivocal evidence that Grid Radio's circumstances warranted differential application of the ban, we think the Commission could continue to enforce the ban and the chaos-averting licensing regime.

## IV.

■ This brings us to Szoka's challenge to the $11,000 forfeiture. Decrying this sum as "grossly disproportionate to the gravity of the offense," Szoka first argues that the forfeiture violates the Eighth Amendment's Excessive Fines Clause. Appellants' Br. at 50. We disagree. In the case on which Szoka relies, *United States v. Bajakajian,* the government imposed a fine of over $350,000 for failure to report the export of currency. 524 U.S.

321, 324, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). Declaring that forfeiture unconstitutional, the Court was primarily concerned that the potential penalty for illegal export of currency would be indefinite and unlimited—and disproportionate to the offense—if the government could seize whatever amount of currency the unwitting "exporter" happened to be carrying when caught. *Id.* at 334–40, 118 S.Ct. at 2036–39. No such problem exists here. The $11,000 represents the statutory penalty (adjusted for inflation) for unlicensed operation of a radio station, or for each day of a continuing violation. 47 U.S.C. § 503(b)(2)(C); 47 C.F.R. § 1.80(b)(4)–(5). The amount is neither indefinite nor unlimited, nor does it seem excessive in view of Szoka's continued and willful violation of the licensing requirement.

■■ Szoka next argues that the forfeiture is "[n]ot the [p]roduct of [r]easoned [d]ecisionmaking." Appellants' Br. at 52. As in any arbitrary-and-capricious challenge, we "presume the validity" of the agency's action, *Kisser v. Cisneros,* 14 F.3d 615, 618 (D.C.Cir.1994)—a presumption Szoka can overcome only by demonstrating that the forfeiture constitutes a "clear error of judgment," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Nothing in either the record or Szoka's briefs convinces us that the Commission's decision to impose the maximum one-day penalty was clearly erroneous: Szoka intentionally operated a radio station without a license for over five years, continued to operate the station after receiving two Commission warning letters, and even refused to shut down after the Commission imposed the cease-and-desist order and forfeiture. In light of Szoka's "deliberate and willful" violation of

section 301, the penalty seems entirely reasonable. 47 U.S.C. § 503(b)(2)(D) (indicating that in determining the amount of a forfeiture, the Commission "shall take into account," among other things, "the extent[ ] and gravity of the violation and, with respect to the violator, the degree of culpability [and] any history of prior offenses").

■ Finally, in support of his argument that the Commission should have reduced the fine because he demonstrated his "inability to pay," Szoka points to three years of tax returns showing adjusted gross income below the poverty line. Appellants' Br. at 58. He also argues that his three capital assets—radio equipment, a 37% interest in a nightclub lease, and a ½2th interest in a commercial building—are illiquid and unavailable to pay the forfeiture. When Szoka presented this evidence to the Commission, however, the agency noted certain "apparent contradictions" and concluded the evidence was "not ... sufficient to justify reduction of the proposed forfeiture." *Jerry Szoka*, 14 F.C.C. Rcd. at 20,150. Moreover, the Commission indicated that although its Compliance and Information Bureau had invited Szoka to supplement his financial information, he declined to do so. *Id.* at 20,150 n. 2. Indeed, Szoka's counsel confirmed at oral argument that Szoka neither submitted the requested supplemental information nor requested a hearing at which to address the contradictions. We therefore find Szoka's inability-to-pay claim waived.

## V.

The decision of the Federal Communications Commission is affirmed.

*So ordered.*