SINCLAIR BROADCAST GROUP, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.

United Church of Christ, et al., Intervenors.

No. 01–1079.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 2002.

Decided April 2, 2002.

Barry H. Gottfried argued the cause for petitioner. With him on the briefs were Martin R. Leader and Kathryn R. Schmeltzer.

John R. Feore Jr. and Scott Dailard were on the brief for amicus curiae Paxson Communications Corporation, urging reversal. Nina Shafran entered an appearance.

Joel Marcus, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Jane E. Mago, General Counsel, Daniel M. Armstrong, Associate General Counsel, FCC, and Jacob A. Lewis, Attorney, U.S. Department of Justice.

Angela J. Campbell, Amy R. Wolverton, Andrew Jay Schwartzman and Harold Feld were on the brief for intervenors.

Before: SENTELLE and ROGERS, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge ROGERS.

Opinion concurring and dissenting in part filed by Circuit Judge SENTELLE.

ROGERS, Circuit Judge:

Recently, in *Fox TV Stations v. FCC*, 280 F.3d 1027 (D.C.Cir.2002), the court addressed the national television ownership caps, remanding the national caps for justification by the Federal Communications Commission and vacating the cable-broadcast cross-ownership rule. *Id.*, at 1033. In so doing, the court construed § 202(h) of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 ("1996 Act"), to "carr[y] with it a presumption in favor of repealing or modifying the ownership rules." *Id.*, at 1048. The local television ownership rule now on review allows common ownership of two television stations in the same local market if one of the stations is not among the four highest ranked stations in the market and eight independently owned, full-power, operational television stations remain in that market after the merger. *See Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, FCC 99–209 (rel. Aug. 6, 1999), 64 Fed.Reg. 50,651 (Sept. 17, 1999) ("*Local Ownership Order*"), *on recons.*, FCC 00–431 (rel. Jan. 19, 2001), 66 Fed.Reg. 9039 (Feb. 6, 2001) ("*Reconsideration Order*") (codified at 47 C.F.R. § 73.3555(b) (2002)). Sinclair Broadcasting Group, Inc. ("Sinclair") challenges the local ownership rule on three principal grounds: it contends that (1) limiting common ownership of television stations in a local market to those with eight independent voices is arbitrary and capricious, (2) failing to fully grandfather existing local marketing agreements violates § 202(g) of the 1996 Act, is impermissibly retroactive, and constitutes an unlawful taking of property in violation of the Fifth Amendment; and (3) the restrictions

violate the First Amendment. We hold that the Commission has failed to demonstrate that its exclusion of non-broadcast media in the eight voices exception is not arbitrary and capricious. Accordingly, we remand the local ownership rule to the Commission for further consideration.

## I.

The duopoly rule prohibited common ownership or control of television stations with overlapping "Grade B" signal contours. *See* 47 C.F.R. § 73.3555(b) (1998). When the rule was promulgated in 1964, the television marketplace consisted only of 649 television stations and a small number of cable systems whose primary purpose was to retransmit the signals of over-the-air broadcast stations. In 1991, the Commission issued a Notice of Inquiry ("NOI"), launching an investigation into whether to relax restrictions on the television industry in view of changes in the video marketplace in the past 15 years, as reflected in a staff working paper. *See Review of the Policy Implications of the Changing Video Marketplace*, Notice of Inquiry, FCC 91–215 (rel. Aug. 7, 1991), 56 Fed.Reg. 40,847 (Aug. 16, 1991). We summarize the rulemaking background relevant to Sinclair's contention that the eight voices exception is arbitrary and capricious.

A year after issuing its NOI, the Commission issued a Notice of Proposed Rulemaking to consider changes to several of the structural rules that governed the television industry. *See Review of the Commission's Regulations Governing Television Broadcasting*, Notice of Proposed Rulemaking, FCC 92–209 (rel. June 12, 1992), 57 Fed.Reg. 28,163 (June 24, 1992) ("*1992 Notice*"). The Commission sought comments, with specific "facts, data, and studies," on "whether and how we might

modify the contour overlap rule to afford broadcasters greater flexibility, yet avoid undue harm to our underlying competition and diversity concerns," and "whether we should further modify our local ownership rules to permit common ownership of television stations with overlapping contours under certain limited circumstances." In regard to the latter, the Commission sought comment on whether it should require that "a minimum number of separately-owned television stations remain in the market" after mergers of existing stations. The Commission observed that a minimum of six independently owned stations would provide outlet capacity for ABC, NBC, CBS, Fox, and two independents and permit mergers in 38 of the top 50 markets.

In 1995, the Commission issued a Further Notice of Proposed Rulemaking, proposing a new analytical framework for evaluating economic and diversity issues in view of developments that had altered the telecommunications landscape and changes in the local marketing agreements ("LMAs") rules for radio. *See Review of the Commission's Regulations Governing Television Broadcasting, Further Notice of Proposed Rule Making,* FCC 94–322 (rel. Jan. 17, 1995), 60 Fed.Reg. 6,490 (Feb. 2, 1995) (*"Further Notice"*). Among other things, the Commission sought guidance on the threshold number, "if any," as would be necessary to ensure a minimum number of independent voices in a community. The Commission observed that a merger-based standard, looking to the merger guidelines of the Justice Department and Federal Trade Commission, might be too low as their purpose lay in defining the point at which heightened antitrust scrutiny is required, and not in encouraging a wide array of voices and viewpoints. The Commission also sought comment on the extent to which television ownership rules should take into account the existence of other competing media. The Commission noted the prospect of increased penetration in the video marketplace by cable, direct broadcast satellite ("DBS"), and wireless cable, as well as the emergence of telephone video dialtone service, and the roles of radio and newspapers as sources of information and news. However, in view of evidence that several of these alternatives are "subscription services" and lack the public interest obligations of broadcast stations, the Commission requested evidence on the extent to which non-broadcast sources "can be considered for diversity purposes as substitutes for broadcast television." The Commission stated its "tentative beliefs" that, although it saw no reason to include other electronic media, cable ought to be included as a substitute for television stations for diversity purposes if information was provided that would enable the Commission to determine the extent to which cable should be counted. While acknowledging that the question was closer, the Commission further explained it could not consider "*each* radio station" and "*each* newspaper" as being the equivalent of a broadcast television station because television is more immediate than newspapers, has public interest obligations not shared by newspapers, has more visual impact than either newspapers or radio, and is used by more people as their primary news source than are either radio or newspapers. The Commission further stated, in regard to ownership caps, that guidelines may be necessary for counting LMAs capturing more than 15% of a station's airtime, similar to the radio LMAs rule, and sought information about the prevalence, purpose, and private and public benefits of LMAs in the television market. The Commission also sought comment on whether further relaxation of the "one-to-a-market" radio-television cross ownership rule was needed.

Then, on February 8, 1996, Congress enacted the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 ("1996 Act"). Focusing on the need to "promote the policies and purposes of this Act favoring diversity of media voices, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity," 1996 Act § 257(b), Congress itself revamped the landscape for radio ownership and the national rules for television ownership while leaving the local rules for television to the Commission. Specifically, as to radio, the 1996 Act eliminated the numerical limit on national ownership and relaxed common ownership restrictions in local radio markets, provided a specific minimum number of radio station voices remained, depending on the size of the market and provided no party owned, operated, or controlled more than 50% of the stations in any market. *See* 1996 Act §§ 202(a) & (b); *see also Implementation of Sections 202(a) and 202(b)(1) of the Telecommunications Act of 1996 (Broadcast Radio Ownership)*, Order, 61 Fed.Reg. 10,689 (March 15, 1996). As to television, the 1996 Act eliminated the nationwide cap on common ownership and increased the national audience reach limit from 25% to 35%, allowing common ownership of television stations provided no single entity dominated more than 35 percent of the national viewing audience. *See* 1996 Act § 202(c)(1); *Fox TV Stations*, 280 F.3d at 1033. Regarding local television ownership rules, Congress directed the Commission to "conduct a rulemaking proceeding to determine whether to retain, modify, or eliminate its limitations on the number of television stations that a person or entity may own, operate, or control, or have a cognizable interest in, within the same television market." 1996 Act § 202(c)(2). As to the Commission's "waiver" policy of allowing a single entity to own a radio-television combination in the largest 25 markets if 30 independent voices remained post-merger, Congress directed the Commission to extend this policy to the largest 50 markets. *Id.* § 202(d). Congress further directed the Commission to conduct a biennial review of all ownership rules to "determine whether any of such rules are necessary in the public interest as a result of competition." *Id.* § 202(h). The 1996 Act also addressed LMAs, *see id.* § 202(g), which we discuss in Part IV.

In October 1996, the Commission issued a Second Further Notice of Proposed Rulemaking addressing the duopoly rule, the "one-to-a-market" rule, and LMAs. *See Review of the Commission's Regulations Governing Television Broadcasting, Second Further Notice of Proposed Rule Making,* FCC 96–438 (adopted Nov. 5, 1996; rel. Nov. 7, 1996), 61 Fed.Reg. 66,-978 (Dec. 19, 1996) ("*Second Further Notice*"). The Commission sought comment on its "tentative conclusion" that common ownership of television stations within a single market (defined as Nielsen designated market areas, or "DMAs") should be permitted so long as their "Grade A" signal contours (narrower than Grade B) did not overlap. The Commission reported that, in response to its proposal in the *1992 Notice* to permit common ownership within the same geographic community so long as six independently owned broadcast stations remained, the submitted comments suggested floors from seven to ten (with NBC suggesting seven). On the question of "substitutability" of non-broadcast sources for broadcast, there was lack of unanimity among the parties as well as a lack of evidence, and the Commission renewed its request for evidence on substitutability. At this point, the Commission proposed to exclude other media from the count of minimum independent voices in a local market "until we observe further

marketplace developments," suggesting the possibility of further deregulation as part of its future biennial review. The Commission also sought comment on whether existing LMAs should be grandfathered if LMAs were counted towards ownership caps.

In the local ownership order, the Commission relaxed the duopoly rule by narrowing the geographic scope from a Grade B contour approach to a DMA test. *See Local Ownership Order* ¶ 8, 47. Thus, common ownership of television stations is permitted without regard to contour overlap if the stations are in separate Nielsen DMAs. Common ownership of stations in the same DMA is permitted, provided their Grade B contours do not overlap (continuing the previous rule) or, where there is Grade B overlap, one of the stations is not among the four highest-ranked stations in the market ("based on audience share as measured by Nielsen or any comparable professional, accepted rating service, at the time the application is filed") and "eight independently owned, full-power and operational television stations (commercial and noncommercial) will remain post-merger" ("the eight-voices exception"). Based on its finding that "[b]roadcast stations, particularly television stations, reach large audiences and are the primary source of news and entertainment programming for Americans," and also because "there remain unresolved questions about the extent to which [non-broadcast television] alternatives are widely accessible and provide meaningful substitutes to broad stations," the Commission determined that the only medium to be counted for purposes of the "eight-voices exception" is broadcast television, unlike the minimum voices exception in the radio-television cross-ownership rule, where certain local newspapers and cable television stations are counted. Mergers will be presumed to be in the public interest if one of the stations in a proposed combination is a failed or failing station, or is not yet constructed. As to LMAs, as proposed in the *Second Further Notice,* LMAs entered prior to November 5, 1996, will be grandfathered, conditioned on the outcome of the 2004 biennial review; LMAs entered on or after that date have two years to conform to the local ownership rule. In a separate order issued simultaneously with the *Local Ownership Order,* the Commission stated that television LMAs will count towards the television ownership caps if the LMA involves more than 15% of a station's air time. *See Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests,* Report and Order, FCC 99–207 (rel. Aug. 6, 1999), 64 Fed.Reg. 50,622 (Sept. 17, 1999) ("*Attribution Order*"), *on recons.,* FCC 00–438 (rel. Jan. 19, 2001), 66 Fed.Reg. 9,962 (Feb. 13, 2001).

Taking into account geographically large DMAs where viewers on the outskirts of a DMA may not receive the signal of some broadcasters in the DMA, the Commission, in a reconsideration order of January 19, 2001, determined to count towards the eight voices only those stations whose Grade B signal contour overlaps with the Grade B contour of one of the stations in the proposed merger. *Reconsideration Order* ¶¶ 16–17. The Commission otherwise generally affirmed the local ownership rule on reconsideration, rejecting the First Amendment challenges to ownership restrictions presented in the initial rulemaking. *Id.* ¶¶ 56–58.

We address in Part II a threshold jurisdictional issue raised by the Commission. Concluding that we have jurisdiction to consider Sinclair's challenges to the *Local Ownership Order* as well as the *Reconsideration Order,* we address in Part III Sinclair's contention that the Commission acted arbitrarily and capriciously in pro-

mulgating the local ownership rule; in Part IV Sinclair's challenge to the Commission's regulation of television LMAs; and in Part V Sinclair's First Amendment contentions.

## II.

■ Sinclair's petition for review stated that it sought review of the report and order issued January 19, 2001, and attached a copy of the *Reconsideration Order* of that date, which Sinclair denominated as the "TV Ownership Order"; the petition did not mention the underlying *Local Ownership Order* of August 6, 1999. In *Interstate Commerce Commission v. Brotherhood of Locomotive Engineers*, the Supreme Court held an agency's reconsideration order is not a final order for purposes of judicial review. *See* 482 U.S. 270, 278–280, 107 S.Ct. 2360, 2365–67, 96 L.Ed.2d 222 (1987). Absent new evidence or changed circumstances presented to the agency upon reconsideration, the court lacks jurisdiction to hear a challenge to an agency's order denying reconsideration of its earlier administrative ruling. *See, e.g., Southwestern Bell Telephone v. FCC*, 180 F.3d 307, 310–11 (D.C.Cir.1999); *Beehive Telephone Company, Inc. v. FCC*, 180 F.3d 314, 318–19 (D.C.Cir.1999); *Entravision Holdings, LLC v. FCC*, 202 F.3d 311, 312 (D.C.Cir.2000). Sinclair maintains, however, that its intent to seek review of the *Local Ownership Order* could be inferred from the statement of issues that it filed with its docketing statement as well as from its emergency motion for a stay. The Commission disagrees.

The law in this circuit on when a petitioner's failure to designate the correct order is fatal has evolved. On the one hand, the court has held, citing Federal Rule of Appellate Procedure 15(a)(2)(C), that unless an agency order is specified in the petition for review, the court lacks

jurisdiction to review the order. Thus, in *City of Benton v. Nuclear Regulatory Comm'n*, 136 F.3d 824 (D.C.Cir.1998), it was irrelevant that a docketing statement named one of the correct agency orders and attached a copy of the unnamed order because the named order was merely a nonfinal interlocutory order and was issued while the final order was still pending. *Id.* at 825. Similarly, in *John D. Copanos and Sons, Inc. v. FDA*, 854 F.2d 510, 527 (D.C.Cir.1988), the court declined to infer an intent to appeal unnamed agency orders from the petitioner's reference to a prior order even though they were part of the same administrative record. In *Small Business in Telecommunications v. FCC*, 251 F.3d 1015, 1021–22 (D.C.Cir. 2001), the court likewise declined to infer an intent to appeal an order issued two years earlier that was not part of the same proceeding, stating that petitioner's motion to amend the rulings under review, filed four months after the petition, implied that the unnamed ruling was merely an "afterthought occurring several months down the road." *Id.* at 1022. The petitioner also had not argued that its intent to appeal the unnamed order could be fairly inferred from a reference in the statement of issues. *See id.* at 1021, n. 8.

In non-agency cases, on the other hand, looking to Federal Rule of Appellate Procedure 3(c)(1)(B), the court held in *Brookens v. White*, 795 F.2d 178 (D.C.Cir.1986) (per curiam), that "a mistake in designating the judgment ... should not result in loss of the appeal as long as the intent to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake." *Id.* at 180 (quoting 9 J. MOORE & B. WARD, MOORE'S FEDERAL PRACTICE, § 203.18 (2d ed.1985)). This approach was confirmed by the Supreme Court, which instructed in *Smith v. Barry*, 502 U.S. 244, 248, 112

S.Ct. 678, 681–82, 116 L.Ed.2d 678 (1992), that Rule 3's requirements are to be "liberally construe[d]" such that "when papers are 'technically at variance with the letter of [Rule 3], a court may nonetheless find that the litigant has complied with the rule if the litigant's action is the functional equivalent of what the rule requires.'" Rule 3 was amended in 1993 to provide that "[a]n appeal must not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice." FED. R.APP. P. 3(c)(4) (2001).

■ For purposes of the instant appeal, the distinction between administrative appeals under Rule 15(a)(2)(C) and civil appeals under Rule 3(c)(1)(B) all but evaporated when the court deemed a petition for review under Rule 15 to be analogous to a notice of appeal under Rule 3. In *Southwestern Bell*, the court, upon noting that no party had suggested that a Rule 15 petition is not analogous to a notice of appeal under Rule 3, proceeded to apply the *Brookens* test in looking at contemporaneously filed documents to determine whether the intent to appeal an order unnamed in the petition for review could be fairly inferred. 180 F.3d at 313 & n*. Other circuits had taken a similar approach in construing Rule 15(a). *See Gottesman v. INS*, 33 F.3d 383, 388 (4th Cir.1994); *Castillo-Rodriguez v. INS*, 929 F.2d 181, 183–84 (5th Cir.1991); *see also Shell Oil Co. v. Fed. Power Comm'n*, 509 F.2d 176, 178 (5th Cir.1975). The court in *Southwestern Bell* found no mention of the unnamed order in either the docketing statement or the preliminary statement of issues. 180 F.3d at 313. Observing that "the lack of prejudice is a necessary, not sufficient, condition for excusing a petitioner's mistake in naming the order of which review is sought," the court denied the

petition for review of an unreviewable order. *Id.* at 314. If the unnamed agency order is not mentioned in any contemporaneously filed documents, the defect cannot be cured because the agency has not received adequate notice. *See id.* at 313. Similarly, in *Entravision Holdings*, 202 F.3d at 314, the court held it lacked jurisdiction to review an agency order that was mentioned only in describing the reconsideration order, concluding that "the clear import is that only the [reconsideration] order is under review." *Id.* In contrast, where the unnamed underlying order was mentioned in a contemporaneously filed document, such as the docketing statement or certificate of rulings on review, or discussed in a timely stay motion, the court held that it had jurisdiction because the petitioner's intent was fairly inferrable and thus the agency received adequate notice. *See Martin v. FERC*, 199 F.3d 1370, 1372–73 (D.C.Cir.2000). Likewise, where the certificate of rulings being appealed identified an order not named in the petition for review, but the order was described in the petition for review in terms indicating that an appeal of the unnamed underlying order was intended, the court held it had jurisdiction to review the underlying order because the petitioner's intent could be fairly inferred. *See City of Oconto Falls v. FERC*, 204 F.3d 1154, 1160 (D.C.Cir.2000).

■ The Commission, relying on *Entravision, Small Business in Telecommunications,* and *Southwestern Bell,* maintains that because Sinclair's contemporaneously filed documents, including its certificate of counsel, refer only to, and attach a copy of, the *Reconsideration Order,* Sinclair's "boilerplate" arbitrary and capricious issue in its statement of issues was insufficient to give fair notice of its intent to appeal more than the *Reconsideration Order.* There is some merit to the Commission's position. Sinclair is a large, sophisticated

company represented by experienced counsel who could be expected to name in the petition for review the order or orders Sinclair seeks to appeal, in accordance with the appellate rules of procedure. Nevertheless, consistent with instruction from the Supreme Court with regard to Rule 3 and this court's gloss onto Rule 15(a)(2)(C) of Rule 3(c)(4)'s harmless error standard, the court is required to look beyond the petition for review. Thus, for example, in *Schoenbohm v. FCC*, 204 F.3d 243 (D.C.Cir.2000), the court concluded that the petitioner's statement of reasons "expressly list[ing] each of his challenges to the underlying order" sufficed to raise the "substantive merits" of the underlying agency order. *Id.* at 246. Similarly, in *Independent Petroleum Ass'n of America v. Babbitt*, 235 F.3d 588 (D.C.Cir.2001), and *Damsky v. FCC*, 199 F.3d 527, 533 (D.C.Cir.2000), the court concluded that the petitioners' statements of issues provided clear indication to the agency of petitioners' intent to appeal the underlying agency order that was not named in the petition for review. *Babbitt*, 235 F.3d at 593–94; *Damsky*, 199 F.3d at 533.

■ Sinclair's "non-binding statement of the issues" cannot be cast aside as readily as the Commission suggests. As the Commission would have it, Sinclair's arbitrary and capricious issue is simply "a boilerplate claim raised in every agency case" and is unlike both the statement of issues in *Schoenbohm* that could have referred only to the underlying order and not the reconsideration order, and the notice of appeal in *Damsky* that referred to the underlying order. The distinctions are not so fine as the Commission suggests. Sinclair's statement of issues named the "new local television ownership regulations" as the source of each of its issues, three involving challenges under the Constitution and a fourth issue stating that the Commission "acted arbitrarily, capriciously, and otherwise contrary to law in imposing the new local television ownership regulations on broadcasters." Boilerplate or not, the fourth issue, fairly read, can only refer to the *Local Ownership Order* of August 6, 1999, and thus gave notice to a reasonably intelligent person that Sinclair intended to make a substantive challenge to the underlying *Local Ownership Order* and not only to the *Reconsideration Order*. Sinclair's statement of issues, which was filed with its docketing statement, was filed thirty-four days after the petition for review, in accordance with the order of the clerk of this court. By contrast, Sinclair's reliance on its motion for a stay, which was filed ninety-one days after the petition for review, can hardly be considered a "contemporaneous" filing. *See Small Business in Telecommunications*, 251 F.3d at 1022. Moreover, as in *Schoenbohm* and *Damsky*, the Commission does not claim it was prejudiced or misled, *see Schoenbohm*, 204 F.3d at 246; *Damsky*, 199 F.3d at 533, and we find neither for the Commission addressed both Orders in its brief. *Cf. Oconto Falls*, 204 F.3d at 1160; *Martin*, 199 F.3d at 1373.

Accordingly, because Sinclair's intent to appeal the *Local Ownership Order* can be fairly inferred from its contemporaneously filed statement of issues, the court has jurisdiction to consider Sinclair's challenges to both Orders.

### III.

Sinclair's challenge to the local ownership rule as arbitrary and capricious focuses primarily on the eight-voices exception, contending that it lacks any rational foundation or "connection to the amorphous goal of 'diversity.'" In its view, the Commission "plucked the number eight out of thin air" and arbitrarily defined "voices" to exclude media that were in-

cluded in the radio-television cross-ownership rule. Sinclair contends that there is no longer any threat that diversity of programming sources, much less diversity of viewpoints, will be diminished if the Commission does not limit ownership of television stations in local markets, and, consequently, the Commission has failed to show the local ownership rule is necessary in the public interest. Sinclair observes that the Commission acknowledged both that the video marketplace has changed substantially since 1964 when it first promulgated the duopoly rule, and that a theory exists that common ownership can lead to better and more varied programming.

■ In reviewing a contention that an agency rule is arbitrary and capricious, the court generally examines whether the Commission has considered the relevant factors and has provided a reasoned explanation for its action that does not "run[ ] counter to the evidence before [it]." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *see also AT&T Corp. v. FCC*, 113 F.3d 225, 229 (D.C.Cir.1997). Where issues involve "elusive" and "not easily defined" areas such as programming diversity in broadcasting, *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 796–97, 98 S.Ct. 2096, 2113, 56 L.Ed.2d 697 (1978) ("*NCCB*"), our review is considerably more deferential, according broad leeway to the Commission's line-drawing determinations. *See AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C.Cir.2000). Our review here is necessarily informed, however, by Congress' instruction in § 202(h) of the 1996 Act that, in addition to reviewing its ownership rule biennially to "determine whether any of such rules are necessary in the public interest as a result of competition[,] [t]he Commission shall repeal or modify any regulation it determines to be no longer in the public interest." 1996 Act § 202(h). This sentence appears as the last sentence of Congress's instruction that the Commission review each of its ownership rules every two years "which the court characterized as designed to continue the process of deregulation." *Fox TV Stations*, 280 F.3d at 1033. The court in *Fox TV Stations* concluded that "[s]ection 202(h) carries with it a presumption in favor of repealing or modifying the ownership rules," *id.* at 1048, thus limiting the Commission's authority only to retain a rule "necessary in the public interest." 1996 Act § 202(h). So understood, we first look to the Commission's explanation of the local ownership rule in the *Local Ownership Order* and *Reconsideration Order* and then turn to Sinclair's challenges to the eight-voices exception.

### A.

■ In the *Local Ownership Order*, the Commission focused on "ensuring a sufficient number of independently owned outlets . . . [to] maximize the available independent viewpoints in a given local market." It took as a basic tenet of national communications policy that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public" in diversity (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 663, 114 S.Ct. 2445, 2470, 129 L.Ed.2d 497 (1994)). That outcome, the Commission explained, is, in its judgment, significantly less likely with greater concentration of media ownership. In concluding that continued local ownership restrictions were required in the public interest, the Commission noted that in *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 571 n. 16, 110 S.Ct. 2997, 3012 n. 16, 111 L.Ed.2d 445 (1990), *overruled on other grounds Adarand Constructors, Inc. v. Pena*, 515 U.S. 200,

115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the Supreme Court upheld the Commission's judgment that there is a positive correlation between a station's ownership and its editorial viewpoint. The Commission noted further that in *NCCB*, 436 U.S. at 796–97, 98 S.Ct. at 2112–13, the Court held that the Commission had acted rationally, despite the inconclusiveness of the rulemaking record, in finding that diversification of ownership would enhance the possibility of achieving greater diversity of viewpoint. Observing also that "ownership carries with it the power to select, to edit, and to choose the methods, manner and emphasis of presentation," *Local Ownership Order* ¶ 22 (quoting *Metro Broadcasting*, 497 U.S. at 571 n. 16, 110 S.Ct. at 3012 n. 16), the Commission found that broadcast television station owners provide essential services, including "local and national news, election results, weather advisories, access for candidates, children's educational programming, and other public interest programming." Both independent stations and the networks' local affiliates, the Commission found, "air locally-originated programming, primarily local news and sports." Therefore, the Commission concluded, reiterating its goal from 1964, "the greater the diversity of ownership in a particular area, the less chance there is that a single person or group can have 'an inordinate effect, in political, editorial, or similar programming sense, on public opinion at the regional level.'" As to the need to ensure economic competition, the Commission reasoned that "[c]ompetition is likely to be greater in markets where many separate firms vie to serve the customer than in markets where few firms serve the market." But for our conclusion in Part III C, *infra*, the Commission adequately explained how the local ownership rule furthers diversity at the local

level and is necessary in the "public interest" under § 202(h) of the 1996 Act.

The Commission determined, in view of changes in the video marketplace since 1964, that because "there may be some intermedia substitutability in the markets served by broadcasters," this "justifies some relaxation of our local television ownership rules, as it suggests that consumers and advertisers may have more viable alternatives to broadcast stations than they once had." Because of the high degree of consolidation in the broadcast industry since the passage of the 1996 Act, with a resultant downward trend in the number of station owners in each market, and in recognition of the economic benefits of common ownership, the Commission confronted what it described as an "exercise in line drawing" between allowing broadcasters to realize economic efficiencies and service benefits, and ensuring diversity and competition. The Commission found that "broadcast television [is] the primary source of news and information for most Americans," *Local Ownership Order* ¶ 40, and concluded that only a limited degree of relaxation of local ownership restrictions was warranted in view of unresolved issues about the extent to which alternatives provide meaningful substitutes to broadcast stations and are widely accessible. First, the Commission found that the total number of television and radio stations had increased by more than 85% since 1970, while consumer choice had been increased by the introduction of DBS, cable, home satellite dishes, open video systems, the internet, and the less well known sources, wireless cable (MMDS) and single building cable (SMATV) systems. But, second, the Commission observed that many non-broadcast sources "are still establishing themselves in the marketplace and generally do not provide an independent source of local news and informational programming." Third, the Commission reported

that, despite repeated requests for evidence regarding the degree to which cable, DBS, home satellite dishes, open video systems, the internet and other alternative media serve as economic substitutes for broadcast television, it had "received no evidence quantifying intermedia substitutability.... [and was] aware of no definitive empirical studies."

Sinclair does not contest that, in fact, this was the state of the record before the Commission. Rather, as the Commission suggests in its brief, Sinclair is focusing on a changed television market, with highly diverse programming, that in its view ownership restrictions cannot help achieve, while the Commission has focused largely on viewpoint diversity. *See, e.g., Local Ownership Order* ¶¶ 22–23; Br. of Respondent at 24–27. The latter addresses station owners bringing unique points of view to the selection of material they air; the former addresses the number of different types of programs on the air, regardless of whether they reflect differing editorial viewpoints. The Commission concludes in its brief on appeal that, consequently, Sinclair's contention that the Commission failed to present substantial evidence that ownership diversity will lead to programming diversity is beside the point. In any event, Sinclair overstates the burden on the Commission. In *NCCB*, the Supreme Court stated that:

> As the Court of Appeals observed, "[d]iversity and its effects are ... elusive concepts, not easily defined let alone measured without making qualitative judgments objectionable on both policy and First Amendment grounds." [*National Citizens Committee for Broadcasting v. F.C.C.*] 181 U.S.App. D.C. [1], at 24, 555 F.2d [938], at 961 [(D.C.Cir. 1977)]. Moreover, evidence of specific abuses by common owners is difficult to compile; "the possible benefits of competition do not lend themselves to de-

tailed forecast." *FCC v. RCA Communications, Inc.*, 346 U.S. 86, 96, 73 S.Ct. 998 [1005], 97 L.Ed. 1470 (1953). In these circumstances, the Commission was entitled to rely on its judgment, based on experience, that "it is unrealistic to expect true diversity from a commonly owned station-newspaper combination." *NCCB*, 436 U.S. at 796–97, 98 S.Ct. at 2113.

 Sinclair's reliance on *Lamprecht v. FCC*, 958 F.2d 382 (D.C.Cir.1992), is misplaced, for the expectation that a particular type of person, *e.g.*, women, will select particular types of programming is not the same as the expectation that a variety of owners will present a variety of editorial viewpoints. To the extent Sinclair maintains that consideration of competition is beyond the proper purview of the Commission, it is simply wrong. *See NCCB*, 436 U.S. at 795, 98 S.Ct. at 2112. Insofar as Sinclair relies on the Commission's findings that the media market has changed since 1964 and that consolidated ownership may result in diversity of programming, Sinclair fails to acknowledge that the scarcity rationale adopted by the Supreme Court in *National Broadcasting Co. v. United States*, 319 U.S. 190, 226–227, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943) ("*Nat'l Broad.*"); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 388, 89 S.Ct. 1794, 1805–06, 23 L.Ed.2d 371 (1969), is both at issue in television broadcasting and binding on this court. *See Fox TV Stations*, 280 F.3d at 1046. In *FCC v. League of Women Voters*, 468 U.S. 364, 376 n. 11, 104 S.Ct. 3106, 3115 n. 11, 82 L.Ed.2d 278 (1984), the Supreme Court stated: "We are not prepared ... to reconsider our longstanding [scarcity rationale] without some signal from Congress or the [Commission] that technological developments have advanced so far that some revision of the system of broadcast

regulation may be required." Absent such signals, the Court has refused to abandon the scarcity rationale. *See Turner Broad.,* 512 U.S. at 638, 114 S.Ct. at 2456–57.

## B.

■ Our review of Sinclair's challenges to the "eight-voices exception" proceeds in recognition that the Commission "has wide discretion to determine where to draw administrative lines," and, therefore, the court will reverse that choice only for abuse of discretion. *See AT&T Corp.* 220 F.3d at 627. Thus, the court is "generally 'unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that the lines drawn ... are patently unreasonable, having no relationship to the underlying regulatory problem.'" *Cassell v. FCC,* 154 F.3d 478, 485 (D.C.Cir.1998) (quoting *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 60 (D.C.Cir.1977)). Choosing the number eight and defining "voices" are quintessentially matters of line drawing invoking the Commission's expertise in projecting market results. The Commission, observing that it has historically used voice-count tests as a means of promoting diversity, concluded, upon taking into account current marketplace conditions, that the eight-voices standard "strikes what we believe to be an appropriate balance between permitting stations to take advantage of the efficiencies of television duopolies while at the same time ensuring a robust level of diversity."

We leave for another day any conclusion regarding the Commission's choice of eight. There is an obvious interrelatedness between the Commission's choice of eight and its definition of "voices." Succinctly put, Sinclair contends that the Commission has not provided any justification for counting fewer types of "voices" in the local ownership rule than it counted in

its rule on cross-ownership of radio and television stations. We agree, for notwithstanding the substantial deference to be accorded to the Commission's line drawing, the Commission cannot escape the requirements that its action not "run[ ] counter to the evidence before it" and that it provide a reasoned explanation for its action. *Motor Vehicle,* 463 U.S. at 43, 103 S.Ct. at 2867. Thus, even were we to reject Sinclair's assertion that the number eight was "plucked out of thin air," in view of the rulemaking record, our resolution of Sinclair's challenge to the Commission's definition of "voices" requires that the rule be remanded to the Commission. On remand the Commission conceivably may determine to adjust not only the definition of "voices" but also the numerical limit.

The Commission included a voice-count provision in both the radio-television cross-ownership rule and the local television ownership rule. For the cross-ownership rule, the Commission included as "voices" not only broadcast television and radio stations but also independently owned daily newspapers with circulation exceeding five percent of households in the DMA, and cable systems providing generally available service to television households in the DMA, provided all cable systems, within the DMA are counted as one single voice. *Local Ownership Order* ¶ 111. The Commission found that "[t]he public continues to rely on both radio and television for news and information, suggesting the two media both contribute to the 'marketplace of ideas' and compete in the same diversity market." The Commission also found, in addressing market shares, that radio and television "serve as substitutes at least to some degree for diversity purposes." Further, the Commission concluded that newspapers and cable systems "are an important source of news and information on issues of local concern and compete with

radio and television, at least to some extent, as advertising outlets." *Id.* ¶ 113. Regarding cable systems, the Commission acknowledged that public, educational, and governmental channels "present local informational and public affairs programming to the public," such as city council meetings.

By contrast, in the local ownership rule the Commission excluded all media sources except broadcast television in defining "voices." It gave two reasons for doing so. First, the Commission stated that its decision to exclude non-broadcast media from its definition of "voices" was based on its finding that "broadcast television remains the primary source of news and information for most Americans." *Id.* ¶ 40 & n. 73. To support its finding, the Commission pointed to a study, "America's Watching, Public Attitudes Toward Television," by Roper Starch Worldwide, Inc., based on 2000 in-person interviews conducted in-home in March 1997. That study compared television generally to newspapers and radio, and then addressed broadcast television programming other than news. The Roper study also compared broadcast and cable television as sources of entertainment, finding that 93% of Americans watched a program on a broadcast network or local station during a seven-day period, and that the "four major networks" were the "type of television" that 55% of families with children under age 18 watched, compared to cable (22%) and premium cable (9%) and the type of television Americans "make a special effort to watch" 67% of the time, compared to 25% for basic cable and 5% for premium cable. At no point, however, did the Roper study compare broadcast to non-broadcast television as sources of news, much less as sources of local news. Rather, the Roper study simply indicated that nearly 70% of adults get most of their news from television—almost twice the number that list newspapers as their main source of news and five times the number that list radio.

Although the Roper study did not differentiate between broadcast and cable television as sources of news, the Commission repeatedly points to the study as support for its finding on the primacy of broadcast television in news. This is true when the Commission states that the "viewpoint a station uses in presenting the news can have a substantial impact on a local election" and when it states that "broadcast television, more so than any other media, continues to have a special, pervasive impact in our society given its role as the preeminent source of news and entertainment." *Local Ownership Order* ¶¶ 18, 68. Likewise on reconsideration, in reaffirming that "only broadcast TV stations ... are the primary source of news and other information," the Commission points to its original order, which in turn relies on the Roper study. *See Reconsideration Order* ¶ 22.

The rulemaking record does not fill the evidentiary gap. Comments submitted to the Commission suggested that the 1994 Commission Report reprinted in the *Federal Communications Law Journal* stated that "more than 70% of the public say they depend upon broadcast television for most of their local news," when, in fact, the Journal article statement includes neither the word "broadcast" nor the word "local." *See* D. Bartlett, *The Soul of a News Machine*: *Electronic Journalism in the Twenty–First Century*, 47 FED. COMM. L. J. 1, 17 (Oct.1994). The Commission's conclusion that "the top four-ranked stations in each market generally have a local newscast, whereas lower ranked stations often do not have significant local news programming, given the costs involved," offers no further insight on the critical question. Indeed, the Commission's 1994 Cable Competition Report, stating that

more than half of all viewing hours in cable households during the 1992–93 season were of re-transmitted broadcast signals leaves open the possibility of considerable non-retransmitted programming.

■ The second reason the Commission gave for limiting "voices" to broadcast television involved the "unresolved questions about the extent to which [non-broadcast] alternatives are widely accessible and provide meaningful substitutes to broadcast stations." *Local Ownership Order* ¶ 33. In the 1995 *Further Notice*, the Commission proposed to include cable systems as well as broadcast, acknowledging that their low market penetration at the time may rapidly change, and sought comments on which suppliers should be included. *See Further Notice* ¶ 29. The Commission concluded that, in the absence of "definitive empirical studies quantif[ying] the extent to which the various media are substitutable in local markets," the "unresolved questions" on substitutability precluded further relaxation of local ownership restrictions. The Commission explained that "[t]his is a critical issue, for many of the arguments for greater relaxation or elimination of our ownership rules are premised on the assumption that consumers and advertisers have the option of turning to a large number of non-broadcast media." This "wait-and-see approach, however, cannot be squared with its statutory mandate . . . to 'repeal or modify' any rule that is not 'necessary in the public interest.'" *Fox TV Stations*, 280 F.3d at 1042.

The deficiency of the Commission's explanation is underscored by the explanation it failed to give for defining "voices" differently in the cross-ownership and local ownership rules. Both rules address monopolization of an industry in view of the limited number of broadcast licenses available in spectrum. The cross-ownership rule addresses the problem of saturation of a community by a single editorial voice through numerous media outlets, allowing ownership of two television stations and a varying number of radio stations depending on the remaining number of independently owned media voices in the market. The Commission based its decision to relax the cross ownership restrictions in recognition of "the growth in the number and types of media outlets, the clustering of cable systems in major population centers, the efficiencies inherent in joint ownership and operation of both television and radio stations in the same market, as well as the public service benefits that can be obtained from joint operation." *Local Ownership Order* ¶ 102. It viewed "the voice test components of the revised rule [to] ensure that the local market remains sufficiently diverse and competitive." *Id.* Having found for purposes of cross-ownership that counting other media voices "more accurately reflects the actual level of diversity and competition in the market," *id.* ¶ 107, the Commission never explains why such diversity and competition should not also be reflected in its definition of "voices" for the local ownership rule. On reconsideration the Commission reiterated its earlier reasons for excluding other media from "voices" in the local ownership rule. *See Reconsideration Order* ¶ 22. To the extent the Commission stated that "[o]ther video programming distributors, such as cable and DBS, typically do not serve as *independent* sources of local information [as] most of any local programming they provide is originated by a broadcast station," *id.*, it ignores the implications of its findings about cable systems in the cross-ownership rule.

At oral argument, the Commission suggested that even assuming complete substitutability of cable news for broadcast news still would leave the 20% of the view-

ing public that lacks cable dependent on television broadcast news alone, and their sources of diversity would be diminished if non-broadcast media were counted towards the eight voices test. As indicated in the Commission's Third Annual Report to Congress on Cable Competition, No. CS 97–1 (Released January 2, 1997) and the 1994 Cable Competition Report, cable, satellite, and other media sources generally are not as widely available as free television broadcasting to viewers. Other data pointed to the "digital divide," wherein low income persons and minorities do not have access to the newer technologies. In addition, only broadcast stations have public interest obligations. Yet these considerations did not deter the Commission from including other media in defining "voices" for the purpose of cross-ownership, and it is not readily apparent why they would do so in defining "voices" for the purpose of local ownership.

Accordingly, we hold that the Commission has failed to demonstrate that its exclusion of non-broadcast media from the eight voices exception is "necessary in the public interest" under § 202(h) of the 1996 Act.

### IV.

Challenging the LMA grandfathering provisions of the local ownership rule, *see Local Ownership Order* ¶ 133, Sinclair contends that the Commission's decision to allow only limited grandfathering for LMAs is contrary to § 202(g) of the 1996 Act, constitutes retroactive rulemaking, and is an unconstitutional taking of property. None of these contentions has merit.

### A.

■ The question of whether the Commission had ignored the plain directive of Congress, as Sinclair contends, is ripe for review. Contrary to the position of the Commission, Sinclair presents a purely legal question that will not benefit from consideration in a more concrete form. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977); *Fox TV Stations,* 280 F.3d at 1048–49; *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■ The local ownership rule provides that LMAs in effect prior to November 5, 1996, will be grandfathered until the 2004 biennial review, a period of approximately five years, when their status will be reviewed on a case-by-case basis to assess the appropriateness of extending the LMA, based on public interest factors, digital TV conversion, marketplace conditions, and equities. *See Local Ownership Order* ¶¶ 133, 142, 146–48. Sinclair contends that this is a "blatant violation of Section 202(g)." We disagree.

Section 202(g) of the 1996 Act provides that:

> Nothing in this section shall be construed to prohibit the origination, continuation, or renewal of any television local marketing agreement that is in compliance with the regulations of the Commission.

The statute says nothing about grandfathering. Hence, the only question is whether the Commission's interpretation of the statute is reasonable. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. Sinclair's reliance on legislative history is to no avail. The Senate and House Conference Reports state that grandfathering was to cover "LMAs currently in existence upon enactment of this legislation," *i.e.,* February 8, 1996. *See* S. CONF. REP. NO. 104–230 at 163 (1996); H.R. CONF. REP. NO.

104–458 at 163 (1996). In view of the express acknowledgment in § 202(g) that LMAs were subject to the Commission's continuing regulatory authority, the Commission could reasonably conclude that Congress did not intend permanently to bar the Commission from regulating existing LMAs.

### B.

■■■ Sinclair's contention that the LMA grandfathering provision constitutes impermissibly retroactive rulemaking also fails. The *Local Ownership Order* alters the future effect, not the past legal consequences of LMAs. *See Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 588 (D.C.Cir.2001). The Rule does not either alter the past legality of LMAs or impose any liability for having engaged in LMAs that now constitute an impermissible duopoly or introduce any retrospective duties for past conduct. *See DIRECTV, Inc. v. FCC*, 110 F.3d 816, 825–26 (D.C.Cir.1997); *Buckeye Cablevision, Inc., v. FCC*, 387 F.2d 220, 227–28 (D.C.Cir.1967). At most the *Local Ownership Order* is secondarily retroactive in upsetting expectations at the time the LMAs were entered into. *See Bowen v. Georgetown University Hospital*, 488 U.S. 204, 219, 109 S.Ct. 468, 477, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring). In this regard, the only question is whether the Commission's action was reasonable. *See Bergerco Canada v. U.S.*, 129 F.3d 189, 192–93 (D.C.Cir.1997). Because the Commission's grandfathering decision was consistent with the 1996 Act and fulfills the public interest in diversity, Sinclair fails to demonstrate that the Commission's decision is unreasonable and not a permissible change of policy notwithstanding that it may upset some expectations. Moreover, the Commission left open the possibility of further extensions on a case by case basis as part of its biennial review of the *Local Ownership Order* in 2004.

As to post November 1996 LMAs, the *Local Ownership Order* is consistent with the 1996 Act, and the Commission gave notice in the *Second Further Notice*, that "television LMAs entered into on or after the adoption date of this *Notice* would be entered into at the risk of the contracting parties...." Hence, Sinclair could have no reasonable expectation that post November 1996 LMAs would remain unaffected. Sinclair does not suggest that the LMA provisions in the *Local Ownership Order* were not a logical outgrowth of the Commission's proposal. *See, e.g., Arizona Pub. Service Co. v. EPA*, 211 F.3d 1280, 1299 (D.C.Cir.2000); *see also Nat'l Black Media Coalition v. FCC*, 822 F.2d 277, 283 (2d. Cir.1987); *Spartan Radiocasting Co. v. FCC*, 619 F.2d 314, 322 (4th Cir.1980).

### C.

■■■ Sinclair's Fifth Amendment takings contention fails too. Although the Commission half-heartedly contends that this contention is not properly before the court because it was first raised in the petition for reconsideration, its reliance on *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 89 (D.C.Cir.2001), is misplaced. Sinclair did not seek in its petition for reconsideration to submit new evidence to the Commission that the Commission declined to receive, as occurred in *U.S. Cellular*. Rather, Sinclair raised a legal argument in its petition that the Commission had an opportunity to address on reconsideration. Likewise, the Commission's contention that Sinclair's claim is not ripe with respect to LMAs entered before November 1996 is unpersuasive for the same reasons we noted in rejecting the Commission's contention that Sinclair's statutory challenge was unripe. *See supra* Part III A.

■■■ On the merits, however, the Commission's brief is persuasive. First, Sin-

clair's takings contention appears, the Commission suggests, to be challenging the Commission's decision to consider LMAs attributable ownership interests and thereby subject them to the *Local Ownership Order*. The attribution decision was reached in the *Attribution Order*, which is not before the court. *See Attribution Order* ¶ 83. Second, Sinclair fails to show that the grandfathering provision of the *Local Ownership Order* "reaches a certain magnitude" as to deprive an owner of the use of property. *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). Sinclair has neither provided information about the economic impact on its business of LMA termination, nor provided a basis on which to determine that there will be significant interference with its expectations. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Sinclair's consolidated comments to the Commission simply recount Sinclair's growth and anticipated growth, showing its use of LMAs in some instances, only to conclude summarily that full grandfathering (to encompass the full length of the LMAs including contract term, renewals and assignments permitted by the contract) is necessary to avoid "considerable economic harm to the broadcast television industry." Somewhat more helpfully, Sinclair states in its brief that each LMA (without stating how many there are) has a contract term of five years with a potential five year renewal. Without discounting Sinclair's concern about investors' and banks' financial commitments to the television industry, the information Sinclair has provided still fails under the *Penn Central* analysis.

As to LMAs entered prior to November 5, 1996, the *Local Ownership Order* imposed an additional obligation about which the Commission had forewarned in the *1992 Notice*. The *Local Ownership Order* grandfathers LMAs for a minimum of five years, with the possibility of extension as part of the Commission's 2004 biennial review. Regarding LMAs entered thereafter, the Commission warned in the *Second Further Notice* that LMAs entered into on or after November 5, 1996, "would be entered into at the risk of the contracting parties." Hence, regardless of the contract date, Sinclair fails to show that it had a reasonable expectation of a ten-year contract period commencing after November 4, 1996. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06, 104 S.Ct. 2862, 2874–75, 81 L.Ed.2d 815 (1984); *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958). Sinclair makes no attempt to show that the character of the governmental action at issue, where the Commission balanced interests to determine what was in the public interest, is not of the kind that the Supreme court has declined to hold constitute a taking. *Cf. Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 225–27, 106 S.Ct. 1018, 1026–27, 89 L.Ed.2d 166 (1986) (citations omitted).

## V.

■ Finally, Sinclair's First Amendment challenge to the *Local Ownership Order* is foreclosed by Supreme Court precedent as well as this circuit's precedent. First, contrary to the Commission's view, Sinclair's First Amendment challenges are properly before the court because these claims were raised early in the rulemaking, although not by Sinclair and not expressly addressed by the Commission until its Reconsideration Order. *See Washington Ass'n for Television and Children v. FCC*, 712 F.2d 677, 682 & n. 10 (D.C.Cir. 1983).

■ Second, the court applies a rational basis standard of review. *See NCCB*,

436 U.S. at 796, 801, 98 S.Ct. at 2112–13, 2115; *Time Warner Entm't Co. v. U.S.*, 211 F.3d 1313, 1320, 1321 (D.C.Cir.2000), cert. denied, 531 U.S. 1183, 121 S.Ct. 1167, 148 L.Ed.2d 1026 (2001); *Fox TV Stations*, 280 F.3d at 1046. Sinclair's contention that the *Local Ownership Order* regulates the content of speech and thus is subject to strict scrutiny review, fails under *NCCB*, where the Supreme Court reviewed analogous restrictions on common ownership in a local market and held that such restrictions are "not content related." 436 U.S. at 801, 98 S.Ct. at 2115; *see also Fox TV Stations*, 280 F.3d at 1046; *Time Warner*, 211 F.3d at 1320, 1321. Sinclair's alternative contention that the *Local Ownership Order* is subject to intermediate scrutiny is contrary to *Turner Broad.*, 512 U.S. at 637, 114 S.Ct. at 2456, where the Court refused to abandon the scarcity rationale as a reason for minimal scrutiny in the broadcast context. *Id.*; *see Fox TV Stations*, 280 F.3d at 1046. Although more than minimal scrutiny may be required when a class of broadcasters is singled out, *see League of Women Voters*, 468 U.S. at 384, 104 S.Ct. at 3119–20; *Ruggiero v. FCC*, 278 F.3d 1323, 1324–25, 1330–31 (D.C.Cir.2002) (citing *News America Publ'g, Inc. v. FCC*, 844 F.2d 800, 812 (D.C.Cir.1988)), the *Local Ownership Order* makes no such distinction. Sinclair's suggestion, based on its attorney's letter stating that "some at the Commission have a clear and distinct bias toward Sinclair," fails to show that the choice of the number eight was picked with intent to harm Sinclair; at best, the letter's reliance on hearsay reported in trade press is speculation about administrative motivations, *PLMRS Narrowband Corp. v. FCC*, 182 F.3d 995, 1002 (D.C.Cir.1999), and thus insufficient to invoke more than minimal review. Therefore, the only question is whether the *Local Ownership Order* is rationally connected to its goals of ensuring a diversity of voices and adequate competition in television broadcasting. *See NCCB*, 436 U.S. at 795–96, 98 S.Ct. at 2112–13; *Turner Broad.*, 512 U.S. at 663, 114 S.Ct. at 2469–70.

Third, because "there is no unabridgeable First Amendment right comparable to the right of every individual to speak, write, or publish" to hold a broadcast license, *NCCB*, 436 U.S. at 799, 98 S.Ct. at 2114 (quoting *Red Lion*, 395 U.S. at 388, 89 S.Ct. at 1805–06); *Nat'l Broad.*, 319 U.S. at 227, 63 S.Ct. at 1014, Sinclair does not have a First Amendment right to hold a broadcast license where it would not, under the *Local Ownership Order*, satisfy the public interest. *NCCB*, 436 U.S. at 800, 98 S.Ct. at 2114–15. In *NCCB*, the Supreme Court upheld an ownership restriction analogous to the *Local Ownership Order*, based on the same reasons of diversity and competition, *id.* at 794–95, 800, 802, 98 S.Ct. at 2111–12, 2114–15, 2115–16, in recognition that such an ownership limitation significantly furthers the First Amendment interest in a robust exchange of viewpoints. *Id.* at 795, 796–97, 98 S.Ct. at 2112, 2112–13; *see also League of Women Voters*, 468 U.S. at 380, 104 S.Ct. at 3117–18. The Court stated in *NCCB* that it saw "nothing in the First Amendment to prevent the Commission from allocating licenses so as to promote the 'public interest' in diversification of the mass communications media." *NCCB*, 436 U.S. at 795, 98 S.Ct. at 2114 (quoting *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–25, 89 L.Ed. 2013 (1945)). Sinclair's protest that *NCCB* is no longer controlling because it is undermined by the advent of cable television, DBS, and the internet, is to no avail. The rationale in *NCCB*, based on the necessity that the Commission choose between competing applicants for the same channel and the idea that government allocation of

broadcast frequencies is essential, 436 U.S. at 799, 98 S.Ct. at 2114, applies here. *See League of Women Voters,* 468 U.S. at 376 n. 1, 104 S.Ct. at 3111 n. 1; *Ruggiero v. FCC,* 278 F.3d at 1329; *News America,* 844 F.2d at 811. As this court recognized in *Tribune Co. v. FCC,* 133 F.3d 61 (D.C.Cir.1998), "nothing in the subsequent decisions of the [Supreme] Court has called the constitutional validity of the [*NCCB*] doctrine into question." *Id.* at 69. That said, allocation remains the Commission's task in addressing its duopoly rule, and for reasons we elaborate in Part III *supra,* we hold that as a structural rule the *Local Ownership Order* is consistent with the First Amendment.

 To the extent that Sinclair frames its First Amendment challenge as one against the eight-voices exception rather than the Rule itself, its challenge is meritless. Sinclair contends that by comparison with the more inclusive standard for radio and television cross-ownership, the definition of "voices" here creates an overly broad restriction on television broadcasters' right to speak. As an exception to the local ownership restrictions in the *Local Ownership Order,* the eight-voices exception presents no separate constitutional implications because it imposes no independent burden on speech; if anything, as the Commission states in its brief, *see* Respondent's Br. at 30, it decreases the minimal burden on speech imposed by the *Local Ownership Order.*

Accordingly, we hold that, notwithstanding Sinclair's failure to name the *Local Ownership Order* in its petition for review, the court has jurisdiction to consider Sinclair's challenge to that *Order,* in addition to the *Reconsideration Order,* in view of its timely filed statement of issues, which gave fair notice of its intention to appeal the underlying *Local Ownership Order.* Although we reject Sinclair's statutory challenge to the local ownership rule provision on television LMAs and its constitutional challenges to the local ownership rule as a whole, we hold that the definition of "voices" in the local ownership rule is arbitrary and capricious, and we remand the rule to the Commission for further consideration.

SENTELLE, Circuit Judge, concurring and dissenting in part:

I agree with the majority that we have jurisdiction to hear this case. I also agree that the limited grandfathering of local marketing agreements ("LMAs") in the *Review of the Commission's Regulations Governing Television Broadcasting,* Report and Order, 14 FCC Rcd 12903 (1999) ("*Local Ownership Order*"), is permissible. Therefore I concur in Parts II and IV of the majority opinion. I agree that the amended "television duopoly" rule, as revised to include the "eight voices" exception (the "Local Ownership Rule"), is arbitrary and capricious, therefore I concur in Part III.B. However, I write separately and do not join Part III.A because I would find the Local Ownership Rule arbitrary and capricious for additional reasons. Further, because I believe that section 202(h) of the Telecommunications Act of 1996 mandates that we vacate this arbitrary and capricious Rule and not merely remand it, I dissent from the decision not to vacate.

I.

The Federal Communications Commission ("FCC" or "Commission") argues that the "eight voices" exception to the duopoly rule is a "reasonable exercise of the Commission's line-drawing authority." It claims that the "eight voices" exception ensures the "appropriate level of broadcast diversity," but also insists that it is unnecessary for it to present substantial evi-

dence that the proposed rule will result in "diversity." In the absence of evidence, the Commission then ducks for cover under the Supreme Court's dicta in *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) ("*NCCB*"). There the Court observed that diversity and its effects were "elusive concepts, not easily defined." *NCCB*, 436 U.S. at 796, 98 S.Ct. at 2113. But that does not mean that the Commission may simply cry "diversity!" and thus avoid meaningful appellate review. Purporting to promote "diversity" does not give the agency a free pass. While it is true that the Commission has "wide discretion to determine where to draw administrative lines," *AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C.Cir.2000), such discretion is not unfettered—and here there are no meaningful limits to the diversity rationale offered by the Commission. *See* Majority Op. Part III.A, at 159–162. There is no suggestion as to how much diversity is enough, how much is too little, or how much is too much. As Commissioner Furchtgott–Roth argued in dissent from the Local Ownership Rule, the "amorphously-defined goal [of diversity], and the assumptions upon which it rests, have not been clearly articulated or supported by empirical facts." *Local Ownership Order*, 14 FCC Rcd 12903, FCC 99–209, at 91 (Aug. 6, 1999). "[A]ll we have here, where the goal of 'diversity' in broadcasting is concerned, is an 'overwhelming hunch.' " *Id.* at 91–92. The FCC offers us only truisms, stating that it has struck the right balance, without explaining why. *See id.* at 92. The Commission should define its diversity goal, and in doing so explain the distinctions (and interaction) between programming diversity and viewpoint diversity, rather than simply quoting boilerplate on the "elusiveness" of diversity.

Even accepting for the moment that the FCC could regulate in the name of diversity without further elucidating that goal, it must still, at a minimum, explain how its rule furthers the goal of diversity. Here the FCC claims that the duopoly rule, mitigated only by an eight voices exception, is necessary in order to preserve a diversity of viewpoints in the local market. According to the Commission, the greater the diversity of ownership in a particular area, the less chance there is that a single person or group can have an inordinate effect on public opinion. Further, and critical to the Local Ownership Rule, the Commission's "concern for ensuring diversity in broadcasting is *most pressing at the local level.*" *Local Ownership Order*, ¶ 19 (emphasis added). The Commission concedes that its diversity goal is distinct from its goal of ensuring competition. *See id.* at ¶ 20. Were the goal merely to preserve competition, then the FCC could readily apply the Department of Justice/Federal Trade Commission Antitrust Merger Guidelines. It declined to do so, apparently because its "diversity requirements" are a different goal than competition *per se*. *Review of the Commission's Regulations Governing Television Broadcasting*, Further Notice of Proposed Rule Making, 10 FCC Rcd 3524, ¶ 123 (Jan. 17, 1995). Therefore the FCC must at least make some effort at showing how its Local Ownership Rule furthers diversity *in the local market*—because it is purporting to regulate to protect local diversity. I do not find that showing in the Commission's record. Therefore, I do not join Part III.A of the majority opinion.

II.

I concur with the majority in Part III.B regarding the inadequacy of the Commission's support for its restrictive voice-count provision. I believe, however, that our determination compels vacature of the Lo-

cal Ownership Rule. The FCC argues that in adopting the eight voices exception and the revised duopoly rule, it "decided to act cautiously and alter the rule only slightly." The Commission also reminds the Court that it will keep monitoring the situation, and "can determine whether its cautionary stance remains warranted or whether the rules can be relaxed further" in the next biennial review. But this rulemaking was conducted, in part, pursuant to section 202(h) of the Telecommunications Act of 1996. *See Local Ownership Order,* ¶ 5 & n.13 ("Section 202 directs the Commission to conduct a biennial review of all of its broadcast ownership rules and to repeal or modify any regulation it determines is no longer in the public interest.... We take such action today in amending our TV duopoly and radio-television cross-ownership rules."); *1998 Biennial Review,* 13 FCC Rcd 11276, 11280, ¶ 10 (Mar. 13, 1998) ("We believe that our ongoing review of these rules [including the duopoly rule] satisfies the requirements of Section 202(h) of the Telecom Act.").

As the FCC itself noted in the *Second Further Notice of Proposed Rulemaking,* the 1996 Act "directs the Commission to undertake significant and far-reaching revisions to its broadcast media ownership rules." 11 FCC Rcd 21655, ¶ 2 (Nov. 7, 1996). Section 202(h) requires that the FCC "*shall* determine whether any of such rules are necessary in the public interest as the result of competition," and that the FCC "*shall* repeal or modify any regulation it determines to be no longer in the public interest." Pub.L. No. 104–104, 110 Stat. 56 (1996) (emphasis added). In applying that statute, we have squarely considered and rejected the kind of cautionary approach employed by the FCC in adopting the Local Ownership Rule: "The Commission's wait-and-see approach cannot be squared with its statutory mandate

promptly ... to 'repeal or modify' any rule that is not 'necessary in the public interest.'" *Fox Television Stations, Inc. v. FCC,* 280 F.3d 1027, 1042 (D.C.Cir.2002). Thus, the question before the FCC was whether the duopoly rule was in the public interest—and to keep the rule it had to determine that the answer was yes. "Although a decision under § 202(h) to retain a rule is similar to an agency's denial of a petition for rulemaking, the underlying procedures differ in at least one important respect that requires a different approach upon judicial review: Section 202(h) carries with it a presumption in favor of repealing or modifying the ownership rules." *Fox,* 280 F.3d at 1048. The FCC, however, seems to have assumed the need for the rule, and then attempted to justify it. But "[h]aving framed the present rulemaking proceeding in terms of providing a persuasive rationale for a rule that seemed unnecessary, and having retained that framework, the FCC could not simply assume ... a need for the rule and focus on rebutting specific attacks levied against it. Such review is hardly 'especially searching.'" *Radio-Television News Dirs. Ass'n v. FCC,* 184 F.3d 872, 886 (D.C.Cir.1999) (internal footnote and citation omitted).

Although the majority acknowledges the "statutory mandate" of section 202(h), Majority Op. at 164, it fails to fully appreciate it. This Court has held that "the mandate of § 202(h) might better be likened to Farragut's order at the battle of Mobile Bay ('Damn the torpedoes! Full speed ahead.') than to the wait-and-see attitude of the Commission." *Fox,* 280 F.3d at 1044. While section 202(h) "should not be read to require the court always to vacate a rule improperly retained by the Commission," *id.* at 1048, here the Commission "presumably made its best effort" to justify the Local Ownership Rule, *id.* at 1053, and has come up short. Because the Com-

**172**

mission has failed to justify affirmatively the need for any duopoly rule, with or without an eight voices exception, I would vacate the Local Ownership Rule.

## III.

As I would invalidate and vacate the duopoly rule on statutory grounds, I would not reach the First Amendment question raised by *Sinclair*. However, because the majority have opted only to remand, I will briefly express my thoughts on the constitutional questions.

At the outset, I freely concede (as I must) that this Court "is not in a position to reject the scarcity rationale even if we agree that it no longer makes sense." *Fox*, 280 F.3d at 1046. The Supreme Court has already "declined to question its continuing validity," *Turner Broad., Inc. v. FCC*, 512 U.S. 622, 638, 114 S.Ct. 2445, 2457, 129 L.Ed.2d 497 (1994) (*"Turner I"*), and "it is not the province of this court to determine when a prior decision of the Supreme Court has outlived its usefulness." *Fox*, 280 F.3d at 1046 (citing *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997)). While there may be merit to petitioner's argument that the "diversity" rationale is essentially content-based, and that therefore heightened scrutiny should be implicated, that argument has been rejected. *NCCB*, 436 U.S. at 799–800, 98 S.Ct. at 2114–15; *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 389–91, 89 S.Ct. 1794, 1806–07, 23 L.Ed.2d 371 (1969); *see Fox*, 280 F.3d at 1045–46. Therefore, the FCC can effectively prescribe a limit on the *amount* of speech a person may engage in through broadcast media because a person is prohibited from engaging in more speech (through a second station) if she owns (or programs more than 15% of the content of) another station. Perhaps with now-Chairman Powell's announcement that the "time

has come to reexamine First Amendment jurisprudence as it has been applied to broadcast media and bring it into line with the realities of today's communications marketplace," the Supreme Court will take notice. Commissioner Powell, *Willful Denial and First Amendment Jurisprudence*, Remarks before the Media Institute, Washington D.C. (Apr. 22, 1998), *at* http://www.fcc.gov/Speeches/Powell/spmkp808.html. That being said, this Court is "stuck with the scarcity doctrine until the day that the Supreme Court tells us that the *Red Lion* no longer rules the broadcast jungle." *Tribune Co. v. FCC*, 133 F.3d 61, 69 (D.C.Cir.1998).

### Conclusion

Because I would vacate the Local Ownership Rule, I respectfully dissent from the majority's remedy.